[Crim. No. 40338. Second Dist., Div. One. May 6, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
JACINTO ANIELLE RHINES, Defendant and Appellant.

COUNSEL

Dennis L. Cava, under appointment by the Court of Appeal, and Jacinto Anielle Rhines, in pro. per., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Roy C. Preminger and Frederick C. Grab, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, Acting P. J.—A jury found defendant guilty of rape (Ms. W.) on count I, and not guilty of rape (Ms. H.) on count II. He appeals from the judgment.

About 9 a.m. on September 19 Ms. W., a student, was approached by defendant on a college campus representing himself to be with "The Scholarship Foundation"; he told her she "looked spiritual" and, after some discussion, she agreed to have some juice with him; on the pre-

tense of collecting his mail, he drove her to his apartment; she agreed to go but said she had to come right back to the campus; she intended to wait in the car but went to his apartment when he told her he had some juice. In the apartment they talked and defendant gave her a puff of a marijuana cigarette from which she felt no effect. She said she had to get back to school, but he began reciting poetry about racism and society and not being ashamed of one's body; defendant tried to kiss her and when she refused he appeared to be offended; she kept telling him she had to leave and when she attempted to do so defendant said he wanted to see her "ass"; his tone of voice became more insistent and his facial expression changed "like he was getting angry"; she asked why, but he said it wouldn't matter because he wouldn't see her any more anyway; the second time he asked to see her "ass" his voice became more direct and demanding; she became frightened and he grabbed her wrist and pushed her into the bedroom; she struggled against defendant but he pulled off her pants by force, pushed her onto the bed and raped her; she resisted and struggled to get up but could not because he was on top of her; she cried but he told her "not to cry because he couldn't enjoy raping [her]." Ms. W. asked why he was doing this, and he said "it was the only way he could do it"; she begged defendant to let her go but he said if she did not do as he wished he would keep her there all night. She went to the bathroom and dressed; when she came out he forcibly moved her onto the bed and raped her again; she tried to resist and cried, and again he ordered her to stop. She left the apartment while he was in the kitchen, went to a phone booth and called someone to whom she said she had been raped. Defendant drove by, stopped and told her not to call police because he would lose his job and he was sorry. She walked to the bus, and he approached her again and told her not to call anyone, and he was sorry. Ms. W. went home, called police, was taken to the station by her uncle, then went to the hospital; she accompanied officers to defendant's apartment and identified him as the one who raped her.[1]

---

[1]Count II charged defendant with the forcible rape of Ms. H. on October 22, one month later. He was acquitted on this count but the evidence is summarized herein only insofar as it relates to the sentencing process hereinafter discussed in part III. At 9 a.m. Ms. H. was approached by defendant at a market; he told her she had a "spiritual air," recited a poem and invited her for a meal; she refused but gave him her telephone number; the same day he called her and when she said she was reluctant to go to dinner with him he told her "he honored and respected black women"; she agreed to go with him. At 9:30 p.m. he picked her up but instead of taking her to a restaurant he took her home. They had a marijuana cigarette and started to eat; he jumped up and began to scream he was God and Malcolm X and Martin Luther King and a guru and she needed to learn her place; she was frightened; she started for the door but he

Officer Ysias took Ms. W.'s report; she was frightened and hysterical; when she identified defendant in his apartment she vomited.

Defendant testified he met Ms. W. on campus, told her he worked for the Martin Luther King Scholarship Foundation and invited her to his apartment; he read a poem, they smoked marijuana and talked and he directed his efforts to convince her to have sex with him; he asked to see her "ass" and she acquiesced, he pulled down her pants and led her to the bedroom; she cried out of shyness not fear. Before she left they had another act of sexual intercourse and sat on the couch; he received a telephone call and when he finished, she was gone. He found her in a phone booth and discovered she was angry with him so he left. Defendant testified that Ms. W. was in his apartment with him "in an intimate kind of thing"; that "most black women" know that "when a girl goes to a guy's apartment . . . she kind of knows the guy has sex on his mind" and "That is the way black people deal with each other."

I

■ Appellant claims he was deprived of his right to counsel because he was compelled to represent himself as a result of the trial court's refusal to afford him the opportunity to hire another attorney[2] after he and his present counsel had a breakdown in their attorney-client relationship of such a magnitude as to jeopardize his right to effective assistance of counsel. Neither the record nor the authorities support his contention.

In 1977 defendant was convicted on both counts of rape. The judgment was reversed on appeal and remittitur issued on July 6, 1979. On that day the public defender was relieved due to a conflict of interest,

---

locked it and ordered "Sit down, Bitch" and slapped her; she started to cry and begged to go home but he told her to take off her clothes and directed her into the bedroom where he raped her four or five times during the night; once she tried to escape but he raped her again. In the morning he raped her again then took her home.

Defendant's version of the foregoing was similar to that of Ms. H. but he insisted her participation was voluntary.

[2]The record fails to disclose whether defendant sought a new court-appointed attorney or to retain private counsel at his own expense. The identity of "Mr. Sands" is not disclosed, and the record does not show if he was willing to take defendant's case, defendant intended to retain him, or if he was prepared for trial. However, we will assume that he wished to substitute privately retained counsel for his court-appointed lawyer, Miss Pope.

and private counsel was appointed to represent defendant. The trial resulted in a mistrial for inability of the jury to reach a verdict. Proceedings were reinstated and the trial set for December 29, 1980; on December 22, 1980, defendant moved to relieve Mr. Wager as his counsel and substitute Miss Pope. Thereafter the trial was continued six times on defendant's motion; on the morning of April 13, 1981, jury selection commenced. On April 14 at 11 a.m. Miss Pope moved the court to permit defendant to represent himself; defendant responded, "She does not want to go along with some of my suggestions about how this should be done," and asked to represent himself with the assistance of Miss Pope. The court rejected his request and told him if he represented himself he must do so alone but would not continue the matter. After some discussion the court told defendant if he did not want Miss Pope he would have to be his own lawyer because "We are right in the middle of a trial." A "Mr. Sands" was mentioned by defendant but not identified and defendant conceded that "Mr. Sands" would not be prepared for trial. Finally the court said "All right, what do you want to do? We will proceed with the trial, give you your own lawyer, or you will have to be your own lawyer, or have Miss Pope represent you."[3] After colloquy between the court and Miss Pope, she indicated she and defendant were in disagreement as to how the case should be tried; addressing defendant the court said it was entirely up to him as to what he wanted to do, Miss Pope is an extremely competent lawyer, and "You either want to stay with her, and I won't pressure you one way or the other. [¶] But, if I were in your position, I'd have her; or you can try the case yourself." Miss Pope assured the court that she would do the job to the best of her ability. Defendant said he wished the court would give him time to get a lawyer. The prosecutor then advised the court that at the beginning defendant had expressed dissatisfaction with Mr. Wager, "It seems like it is a ploy, every time we get the jury here and we are starting, he makes some kind of record about his dissatisfaction with an attorney." After some discussion with defendant, the court commented, "You have made—put her [Miss Pope] in an awkward position deliberately, I think." Then asked what he wanted to do, defendant replied "I will stay with Miss Pope if she wants to stay with me," whereupon Miss Pope answered, "Very well, Your Honor."

---

[3]Addressing himself to Miss Pope, the judge continued: "I know that you will use your best efforts, and you have considerable best efforts to devote in this matter. You are extremely competent, qualified, experienced lawyer, and you have a disagreement as to how it should be done. [¶] You, as a lawyer, should try it the way you think it ought to be done." Miss Pope answered, "Yes, that is how I feel."

At 2:08 p.m. on the same day Miss Pope addressed the court stating that defendant had decided to appear in pro. per. The prosecutor made extensive inquiries of defendant, gave him various admonitions, made numerous explanations and took defendant's waivers.

We find no evidence that defendant was "compelled" to represent himself or that "a breakdown of their attorney-client relationship" occurred. To the contrary, the record demonstrates that defendant's election to proceed in pro. per. was voluntary, a choice predicated on his desire to handle the case his own way, and that extensive inquiry by the prosecutor resulted in informed and intelligent waivers; defendant did represent himself, and successfully too, obtaining an acquittal on count II, which prompted the judge to comment that he did not know what motivated the jury to find him not guilty. As to his relationship with his attorney the record establishes Miss Pope as a competent, qualified, experienced lawyer ready, willing and able to effectively represent defendant, and their disagreement to be one solely as to trial strategy. While she originally stated she felt she could not be as effective as she would be "under ordinary circumstances," clearly her reference was to the fact that defendant insisted she follow his suggestions in defending him and while she thought some were excellent, as a lawyer she had to reject those she felt had no merit. She did not, as claimed by appellant in construing *People* v. *Terrill* (1979) 98 Cal.App.3d 291, 301 [159 Cal.Rptr. 360], "vociferously assert to the court that an irremediable breakdown had occurred in the attorney-client relationship." The fact is, Miss Pope represented to the court that their disagreement related to how the case should be handled, and as a lawyer she would use her best efforts in the matter, try the case the way she thought it ought to be tried, do her job as a lawyer, not shirk her responsibility and represent defendant to the best of her ability.

■ A trial court is not required to remove appointed counsel because of disagreement as to trial strategy (*People* v. *Jacobs* (1972) 27 Cal.App.3d 246, 263 [103 Cal.Rptr. 536]) but it may be required to do so if such disagreement has resulted in a breakdown of such magnitude as to jeopardize defendant's right to effective assistance of counsel. (*People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008].) The record here amply supports the conclusion that no such breakdown occurred; there existed only a disagreement as to how the case should be tried. Even if this could be characterized as a breakdown, it is not the kind that would support a motion to substitute

counsel. (*People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 761 [170 Cal.Rptr. 62]; *People* v. *Floyd* (1970) 1 Cal.3d 694, 705 [83 Cal.Rptr. 608, 464 P.2d 64]; *People* v. *Lindsey* (1978) 84 Cal.App.3d 851, 860 [149 Cal.Rptr. 47, 2 A.L.R.4th 485].)

■ The burden is on appellant to establish an abuse of judicial discretion in the denial of his request for continuance to secure new counsel. (*People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 761 [170 Cal.Rptr. 62].) The resolution of the issue depends upon the circumstances of each case. (*People* v. *Byoune* (1966) 65 Cal.2d 345, 347 [54 Cal.Rptr. 749, 420 P.2d 221]; *People* v. *Blake* (1980) 105 Cal.App.3d 619, 624 [164 Cal.Rptr. 480].) ■ The right of a defendant to appear and defend with counsel of his own choice is not absolute but must be carefully weighed against other values of substantial importance such as those seeking "the orderly and expeditious functioning of judicial administration." (*People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 760 [170 Cal.Rptr. 62].) ■ A defendant is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory (*People* v. *Blake* (1980) 105 Cal.App.3d 619, 623 [164 Cal.Rptr. 480]), and the trial court may in its discretion deny a motion for continuance to secure new counsel if the motion is made during trial. (*People* v. *Kaiser, supra*, 113 Cal.App.3d 754, 761; *People* v. *Molina* (1977) 74 Cal. App.3d 544, 548 [127 Cal.Rptr. 434; *People* v. *Reaves* (1974) 42 Cal. App.3d 852, 856 [117 Cal.Rptr. 163].)

After the substitution of Miss Pope, the trial was continued six times on defendant's motion, and on April 13 jury selection commenced. Although defendant had ample opportunity to do so, at no time before or during that day did defendant voice objection to Miss Pope; he waited until 11 a.m. on the second day of jury selection (Apr. 14) before seeking a continuance to secure other counsel. The prosecutor termed defendant's decision at the last moment to relieve Miss Pope a "ploy," and it was characterized by the trial judge, as putting Miss Pope "in an awkward position deliberately." Under the circumstances the motion was not timely made and defendant made no diligent attempt to obtain new counsel. Defendant's rather lengthy colloquy with the trial judge clearly reflects a maneuver undertaken for delay. "The right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel. [Citation.]" (*People* v. *Kaiser* (1980) 113 Cal.App.3d 754, 761 [170 Cal.Rptr. 62].)

## II

After defendant cross-examined Ms. H. he made an offer "to bring—black psychologist [unidentified] in to be a witness to state as an official person that there is a cultural difference between races of people" and that black people speak to each other very loudly. Such proffered testimony was rejected as irrelevant. Appellant cites this as error because he claims his "sole defense was a reasonable belief as to consent," and the testimony would have had a bearing on whether he entertained the reasonable belief that Ms. W. consented to sexual intercourse. He argues that he could have convinced the jury that she thought nothing of his loud voice because it is a common characteristic of black people to talk loud to each other and thus he reasonably thought she attached no significance to it because she was accustomed to such loud speech. He cites *People* v. *Guthreau* (1980) 102 Cal. App.3d 436 [162 Cal.Rptr. 376].

█ We fail to perceive how the proffered testimony would tend to prove or disprove any material issue in the case. (§ 210, Evid. Code.) Appellant relies upon *People* v. *Guthreau, supra,* 102 Cal.App.3d 436 in which the inquiry was "whether the resistance [of the victim] was sufficient to '*reasonably manifest*' her refusal to Guthreau." (P. 441, original italics.) He thus, in effect, frames the issue whether or not Ms. W.'s resistance was sufficient to reasonably manifest her refusal, and whether or not he had a bona fide reasonable belief based upon all of the circumstances that she voluntarily consented. An expert in *Guth reau* testified for the People that it was his opinion the victim's resistance was reasonable under the circumstances, but the court ruled that such evidence is irrelevant to the issue of defendant's bona fide belief. Thus, if the expert testimony as to the reasonableness of the victim's responses as manifesting lack of consent was irrelevant to the issue of defendant's good faith belief in *Guthreau*, so too is proffered expert testimony of the alleged "common characteristic" of the black race of speaking loudly to each other to show Ms. W. thought nothing of his loud talking. The fact is that either Ms. W. was unaware of such so-called "common characteristic" of her race or in reality it does not exist; she testified that his voice was "getting more direct, more demanding" and she was becoming frightened of him. Moreover, irrelevant to the issue raised by his sole defense of reasonable belief as to Ms. W.'s consent is any such purported testimony relating to defen-

dant's conduct of loud talking as opposed to his perceptions or beliefs.[4] The only basis of relevance defendant advanced in the trial court was "an inference of a threat as to my raising my voice." He denied he forced her to do anything, and his claim that his victim consented to sexual intercourse raised the issue whether she voluntarily submitted or whether she submitted because her resistance was overcome by force. Her testimony demonstrates that she was helpless to resist and had to submit because of his use of force; it was never contended that she submitted out of fear engendered by defendant's "loud talking."

Defendant's proffered testimony of a black psychologist concerning "the characteristics of black people to speak very loudly to each other" and the purpose for which he sought to use it is on par with his own testimony concerning black women which we consider to be an inexcusable slur on all females of the black race. Indeed race has no bearing on the reaction or response of a female in the circumstances here, and we deplore the indignity of defendant's effort to excuse his own conduct by demeaning females of the black race. Equally intolerable is the natural result of such proffered testimony—the creation of a new defense to the crime of rape. To allow a race or any group to set up for itself standards of conduct and reasonableness to apply to nonconsenting individuals in the context of rape is a concept that is unthinkable in our society.

### III

Relying on *People v. Harvey* (1979) 25 Cal.App.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396] and *People v. Gutierrez* (1980) 109 Cal. App.3d 230 [145 Cal.Rptr. 823] as "an analogy," appellant submits that not only was it improper for the trial judge to consider any evidence relating to count II, on which he was acquitted, in sentencing him but it indicates he was prejudiced against him.

First, in the context of the procedural posture of this case there can be no reasonable analogy to *Harvey* and *Gutierrez* because they hold

---

[4]Although defendant testified he was "trying to get her in the mood to have sex" and denied "doing anything beyond just convincing her to have sex with [him]," it is clear from Ms. W.'s testimony that at the time he was having intercourse with her he knew he was committing rape—she cried and he told her "not to cry because he couldn't enjoy raping her"; she asked him why he was doing this and he told her this is the only way he could do it; and subsequent to the incident he asked her not to call police and he was sorry, which is indicative of his knowledge of her lack of consent.

that it is improper for the sentencing court to consider any of the facts underlying charges dismissed upon a plea bargain. That which rendered reference to the dismissed charges improper in those cases was the understanding or agreement underlying the plea bargain, an element nonexistent in this case. Moreover, the evidence in relation to count II came to the judge's attention firsthand when he heard it from the witness under oath at trial, a situation quite different from the manner in which the information relative to the dismissed charges came to the judge's attention in *Harvey* and *Gutierrez*. ■ In the sentencing process the court may consider prior arrests which did not result in conviction, defendant's criminal history (*Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 867-868 [132 Cal.Rptr. 464, 553 P.2d 624]) and raw arrest data (*People* v. *Herron* (1976) 62 Cal.App.3d 643, 646 [133 Cal.Rptr. 287]), so long as the information is accurate and reliable (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 719 [135 Cal.Rptr. 392, 557 P.2d 976]) and the judge is not misled into believing an arrest to be a conviction. (*People* v. *Herron, supra*, 62 Cal.App.3d 643, 646.) Whatever facts the judge here considered were received by him in a manner that could not have misled him for he knew that defendant was acquitted in count II.

■ Second, nothing before us demonstrates any judicial bias or prejudice against the defendant. At the time of sentencing the judge was patient in hearing out defendant, listened to the testimony of numerous defense witnesses, permitted defendant to argue at length, at defendant's request reopened and set aside the proceedings after sentence in order to hear his untimely motion for new trial and explained various procedures to defendant, all of which prompted the judge's comment: "We have given the morning to this case [for sentencing] and it must go forward. I have given you more consideration in this matter than any other case I have had in the 20 years I have been on the bench." We see no evidence of bias or prejudice but if any existed it could have resulted only from the nature of the testimony adduced at trial from the testimony of Ms. W. on count I, and defendant's own testimony and statements as to how he seduced his victims.

■ Third, it does not appear that the evidence on count II had any effect on the judge's decision to deny probation. It is clear from a reading of his statement that he relied primarily on the testimony of the forcible rape of Ms. W. and the effect the incident had on her as related to the probation officer, defendant's history of past similar incidents following the same modus operandi, and the probation officer's com-

ment in the report that defendant is a dangerous person who needs to be removed from society. The judge related the following incidents of defendant's past: a rape charge later dismissed (1964), an indecent act on a minor for which he served 180 days in county jail (1969), a battery when the victim refused to submit to his advances (1972), a rape which the victim refused to prosecute (1975), a rape charge dismissed in the interest of justice (1977) and the present incident (1977), the modus operandi in each of which was similar to that in the instant case. The lengthy descriptions of prior sex incidents can only point to defendant as a devious, manipulative, volatile individual who used physical force and psychological traumatization to accomplish his goal of sexual intercourse against the will of his victims. Given the nature of defendant's prior record, the details of past incidents, and the facts of the case at bench, we perceive no prejudice that could have occurred as the result of the court's knowledge of the evidence on count II.

The judgment is affirmed.

Hanson (Thaxton), J., and Dalsimer, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 22, 1982.