[No. B027169. Second Dist., Div. Five. Nov. 29, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD GRAGG, Defendant and Appellant.

**COUNSEL**

Alisa M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, William T. Harter and Susan D. Martynec, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**SUTTON, J.**\*—Defendant Richard Gragg (Gragg) was charged with attempted murder in two counts of a three-count information, originally with three other codefendants who were Sociz John Junatanov (Johnny); Georgeanna Vieweg (Vieweg); and Asror Junatanov (Oscar). Gragg was convicted in count I (the restaurant incident) of the lesser included offense of attempted voluntary manslaughter. Gragg was acquitted in count II (the hospital incident). He was not charged as a defendant in count III.

The claim of error Gragg makes concerns the asserted refusal of the trial court to give an instruction to the jury to the effect the crime of assault with a deadly weapon was a lesser related offense and the additional claim is made that the court erred in imposing the upper term sentence on Gragg in violation of certain of the sentencing rules embodied in the California Rules of Court, rules 401 through 453.

Judgment is affirmed.

The facts of this case are bizarre. The literary talents of Dashiell Hammett, Raymond Chandler, and James M. Cain, in collaboration, would have been hard put to devise any more sordid or outlandish plot than the record here reveals. This case is a raw slice-of-life that exposes the seamier underside of the Hollywood Boulevard street-people subculture.

---

\* Assigned by the Chairperson of the Judicial Council.

The victim is Albert Junatanov (Junatanov), the father of Johnny and Oscar. The record exposes Junatanov as an extremely unsavory person who, by the testimony of supposedly unbiased witnesses, at various times was involved in prostitution, drug trafficking, drug use, and gambling. Junatanov used several aliases, was said to be paranoid, and was subject to attacking people violently upon little or no provocation.

Junatanov subjected his sons Johnny and Oscar, his wife Firuz Junatanov, and his mother-in-law Maria Pinhasova to a course of physical and sexual abuse for some 20 years before the attempt that was made upon his life. He also subjected his family to economic exploitation, death threats, and psychological humiliation. The trial court was prompted to remark in passing sentence on Gragg that Junatanov "was probably one of the most despicable people" the court had ever seen.

In early 1985, because he perceived "there were too many enemies around," Junatanov rented a truck, closed his restaurant on the east coast, moved his family and restaurant equipment west, and rented a place on Hollywood Boulevard to open a restaurant called "The London-New York Shawarama Restaurant." Junatanov leased the building where the restaurant was located in the names of Johnny and Oscar because Junatanov felt when he got into trouble (as he presumably anticipated he would) he did not want people to think he had any assets, should they sue him.

After the restaurant opened, one Danny Solorzano (Solorzano), a pimp for two young female prostitutes, heard that Junatanov "worked for the Mafia" and sought out Junatanov's "protection." Junatanov gave Solorzano room and board for doing odd jobs around the restaurant. The Junatanov family resided in living quarters above the London-New York Shawarama Restaurant.

Solorzano testified at the trial under grant of derivative use immunity. Solorzano once observed Junatanov administer a beating to Oscar for Oscar's failure to add salt to a batch of bread Oscar was baking for the restaurant. The day following this incident, Solorzano discussed with Johnny and Oscar a plan to kill Junatanov. Johnny offered Solorzano $5,000 to kill his father. Solorzano declined to do so, personally, but stated he could find someone else to do it. At this point, a street person named "Mousey" steered Solorzano to the defendant Gragg and Solorzano discussed with Gragg the proposed slaying of Junatanov for a price. Gragg was then age 25, and Vieweg, who had accompanied him to Hollywood from Oklahoma, was age 17. Gragg and Vieweg had been variously living in motel rooms or sleeping in Gragg's car. Gragg's father was a sergeant on the Tulsa,

Oklahoma police force and at this point in his life Gragg's only prior record consisted of minor traffic offenses incurred in Oklahoma.

Gragg agreed to kill Junatanov for payment of $3,000, due following Junatanov's assassination. Some divergency in the evidence occurred concerning the next events. One version had it that Gragg, knife in hand, was lying in wait in the alley behind the restaurant one night at closing time, waiting for Junatanov to emerge. However, Junatanov, upon exiting the restaurant, saw Gragg "with something in his hand" and quickly reentered the restaurant, thus foiling the attempt on his life that could have been made at that time.

On July 20, 1985, about 11:30 a.m., Gragg went to the London-New York Shawarama Restaurant, purchased a soft drink, got a dollar changed, and went to the rear of the restaurant where there was an arcade of video games and pinball machines. Gragg either lost or pretended to lose a quarter in one of the machines and asked Johnny how he could get his quarter back. At this point, Johnny had not previously met Gragg.

Junatanov was summoned to the rear of the restaurant and was confronted by Gragg about the loss of the quarter. Junatanov grabbed Gragg by the hair and slammed his head against the wall. Gragg stabbed Junatanov once in the abdomen and fled. At the trial, Gragg did not testify but a taped statement given by Gragg after his arrest was played on a tape recorder. It was intimated Gragg was acting in self-defense. Junatanov testified he had recognized Gragg from the previous encounter in the alley and that Junatanov perceived Gragg to be an assailant. Whatever the circumstance, Junatanov's liver was lacerated by the stab wound and he was taken to the Hollywood Presbyterian Hospital suffering internal bleeding. He had a convulsion while awaiting treatment in the emergency room at the hospital. Emergency surgery was performed at the hospital to repair Junatanov's liver.

Gragg was refused payment by Johnny because Junatanov had not died. Later, Johnny reported to Solorzano the hospital had advised Johnny that Junatanov would be confined in the hospital for the next two or three days. Johnny suggested Gragg should be shot for botching the job. It was decided Gragg would be given "another chance" after Gragg reaffirmed he still wanted to do the job.

Two days following the emergency surgery, Junatanov awakened in his hospital bed to see Gragg standing beside him. Junatanov shouted and Gragg ran from the room. Junatanov stated he had seen something in

Gragg's hand—Gragg later told Solorzano he had carried a knife into the hospital room but had run from the room when Junatanov started shouting.

Following this, Johnny arranged for Junatanov to be moved to another room in the hospital. Johnny slept overnight in the new room with Junatanov after assuring Junatanov "we will save you—no one will be able to kill you."

Vieweg had arrived in Hollywood with Gragg sometime around July 13, 1985, and since their arrival had stayed with him at the Hollywood-La Brea Hotel. She hailed Gragg in his car from the street one afternoon, noticing Gragg had gotten a haircut and new clothes. Gragg had told her he had gotten a job. She returned with Gragg to the motel room where she met Johnny and watched TV while Johnny and Gragg had a discussion. Vieweg accompanied Gragg to the hospital just before noon on July 21st. Gragg advised her at the time he was going to finish what he had started—that he had "to finish off" Johnny's father. Vieweg observed Gragg conceal a knife with about an 8-inch blade under his jacket—a knife Vieweg testified she knew Gragg had brought with him on their trip from Oklahoma. After about a 45-minute stay in Gragg's car at the hospital, Vieweg stated Gragg returned and reported he was unable to carry through because there were too many people around Junatanov's room.

The next day Johnny returned to the motel room. Gragg, Solorzano, Vieweg and one Darryl Plant were present. Johnny proposed to Vieweg that he wanted to kill his father by injecting him with sulfuric acid based battery fluid and wanted to know whether she would do it. Vieweg was destitute and wanted money to return to Oklahoma, so she agreed. Vieweg then went with Johnny, Solorzano, Gragg and Plant to a uniform store across the street from the Hollywood Presbyterian Hospital, where Johnny made the credit card purchase of a nurse's uniform, white shoes and stockings, as well as a nurse's nameplate inscribed with the name "Cathy."

All returned to the motel where Vieweg changed into the uniform just purchased. Solorzano handed Vieweg two hypodermic syringes someone had filled with battery acid. Johnny announced he was going to return to the restaurant and Gragg assured Johnny they would report back to him there. Gragg and Plant took Vieweg back to the hospital.

Gragg stayed in the car while Vieweg and Plant entered the hospital. Vieweg was fearful she would be stopped but found the room where Junatanov was by following directions Johnny had given her. Junatanov was in the room with a bodyguard. Vieweg recognized Junatanov from a previous time

she had seen him in the London-New York Shawarama Restaurant, when she had gone there with Gragg.

Johnny had previously advised Vieweg that Junatanov had complained of headaches and pain in the area of his stab wound. Vieweg asked Junatanov how his headaches and the pain in his side were, and that she had two injections for him—one for each complaint.

Vieweg attempted to inject one syringe into a vein in Junatanov's arm, but he insisted, instead, that she inject him near the top of his arm. She complied. Junatanov immediately complained his arm burned and Vieweg said she would go find the doctor and return. Instead, with considerable fear of apprehension, she left the hospital.

Plant had positioned himself outside the door to Junatanov's room. When Vieweg left the room, Plant asked if she "had done it." When she said she had, he replied "good" and hugged her. Vieweg discarded the syringe she had used on Junatanov in the parking lot of the hospital where Gragg was waiting in the car. Vieweg insisted they leave but Gragg remained incredulous—he repeated several times "Did you do it?" or "I can't believe you did it." and "Are you telling me the truth?"

Gragg and Vieweg saw Johnny two or three days later after having moved to a different motel. Johnny brought them some food from the restaurant, but reported that Junatanov had survived and his condition was improving. Gragg upbraided Vieweg for not having injected the battery acid into a vein in Junatanov's arm. Johnny was also angry and Vieweg became frightened. Gragg insisted on payment of at least half the promised $3,000 from Johnny but was refused any payment at all because the assassination had failed.

Thereafter, Vieweg left Hollywood without telling Gragg and returned to Oklahoma. She was eventually extradited and was originally designated a defendant in the case but settled her case through the plea-bargaining process. She was sentenced to a term of five years California Youth Authority confinement and was also required to give testimony at the trial.

The whole plot against Junatanov unravelled when Solorzano, in a probable attempt to ameliorate a pending grand theft auto charge, introduced Johnny to a Los Angeles Police Department undercover officer, one Sal Flamenco, in a hastily revived plot to pay Flamenco $5,000 if he would kill

Junatanov with either a .22-caliber gun or shotgun which Johnny was prepared to provide.[1]

The trial commenced August 26, 1986, and concluded October 10, 1986. As stated, Solorzano had been granted derivative use immunity to be able to testify at the trial, and Vieweg testified under the circumstances above noted. Gragg and Johnny were tried together. Oscar had previously entered a guilty plea and eventually was placed on probation.

Thus, Gragg and Johnny were the defendants tried. Count I alleged the charge of attempted murder against Gragg and Johnny in violation of Penal Code sections 664 and 187, subdivision (a). This was the restaurant incident. Count II named Gragg and Johnny as defendants on the same charges. This was "the hospital incident." Count III alleged against Johnny only the charge of solicitation for murder in violation of Penal Code section 653f.

Johnny was acquitted outright on all three counts. Gragg was acquitted on count II, the hospital incident, but was found guilty in count I of the lesser included offense of attempted voluntary manslaughter in violation of Penal Code sections 664 and 192, subdivision (a).

A psychiatric workup pursuant to Penal Code section 1203.03 was ordered on Gragg which prolonged his probation and sentencing hearing until February 20, 1987. Because his conviction was for attempted voluntary manslaughter, and Penal Code section 664 ordinarily "halves" the range of sentence options when a defendant is convicted of an attempted crime, the range of sentences for voluntary manslaughter of three, six, or eleven years (Pen. Code, § 193, subd. (a)) was reduced to eighteen months, three or five and a half years.

Upper term and an additional year's enhancement for the use of a knife by Gragg in stabbing Junatanov was the sentence imposed. The total term was six and a half years. Under Government Code section 13967, subdivision (a) a maximum restitution fine of $10,000 was ordered. Gragg received 800 days presentence incarceration credit, which included 267 days for "good time/work time."

The reporter's transcript runs to some 2,268 pages. However, the error urged in this appeal centers on sentencing issues so that attention is focused

---

[1] Junatanov, following these episodes, claims to have reformed, but he recanted. In a taped interview played before the jury a promise was made never to beat his wife or children again in a confession made to a Lubavitcher rabbi. The rabbi promised death to Junatanov within two years if this pledge was broken. At the trial, Junatanov insisted the voice on the tape was not his, but that of his son, Oscar.

principally on the last 30 pages of the transcript—the probation and sentencing hearing of February 20, 1987. The only other issue raised in this appeal concerns a claim of error on the trial court's part for refusal to instruct the jury that assault with a deadly weapon (ADW) was a "lesser related" offense.

■ The "lesser related" issue is addressed first. Gragg's counsel on appeal, by letter brief, cites the recent Supreme Court case of *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1028 [254 Cal.Rptr. 586, 766 P.2d 1], for the proposition this case is subject to the "lesser related offense" rule established in 1974 by *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913] (disapproved on unrelated points in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]).

This position is taken with all the clarity hindsight provides, however. It must be remembered the charges in the restaurant and the hospital incidents were both alleged as attempted murder in violation of Penal Code sections 664 and 187, subdivision (a). Neither defense counsel nor anyone else could anticipate Gragg's acquittal in the hospital incident or his conviction in the restaurant incident of attempted voluntary manslaughter as a bona fide but strained lesser included offense to the charge of attempted murder. When defense counsel requested an instruction that ADW was a lesser included offense to a charge of attempted murder the trial court promptly and correctly pointed out the case of *In re David S.* (1983) 148 Cal.App.3d 156, 159 [195 Cal.Rptr. 754], which held and reiterated that *People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520] established ADW is not a lesser included offense to the crime of attempted murder. Nothing else appears in the record where defense counsel thereafter ever requested that an instruction be given in this case that ADW was a lesser related offense. (It should be noted in deference to the defendant that the instruction on attempted voluntary manslaughter was given by the trial court, in the first place, over the prosecutor's objection.)

The points made by Gragg's counsel about *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] are certainly true as abstract legal principles, but *Geiger* specifically states (35 Cal.3d at p. 530) the trial court is never under any duty or obligation, sua sponte or otherwise, ". . . to instruct on related offenses in the absence of a request by the defendant for such instructions."

As is so often the case, appellate counsel can indulge the luxury of contemplation and reflective analysis to suggest on appeal all the "ought to haves" trial counsel should have considered, but did not, while battling in the trenches at the trial. Since *Geiger* mandates an instruction on any lesser

(related or included) offense must be requested, no error can be attributed to the trial court for correct adherence to the rule in *In re David S., supra,* 148 Cal.App.3d 156, nor can any fault be ascribed to the trial court for failure to give an instruction ADW was a lesser related offense since no such specific request for the instruction is discernible from the record.

The Supreme Court's salutary reason for this rule is echoed here—the defendant has an absolute right to full knowledge of the charges against him, hence it is necessary for the defendant to request instructions on any uncharged crime(s) and, for the same reason, it would be error for a court to instruct on lesser offenses sua sponte, since to do so would deprive a defendant of the constitutionally necessary foreknowledge of just what crime(s) he is charged with.

There is no error in this case for failure to instruct on an unrequested lesser related offense theory.

Next, Gragg urges sentencing error occurred. While the points raised by Gragg's counsel are more than mere quibbles, they are not much more than that. The trial court upon imposition of sentence made some prefatory remarks. It is agreed here that the trial court correctly observed the only basis the jury had for finding Gragg guilty of the lesser included offense of attempted voluntary manslaughter was through adoption of the *People* v. *Flannel* argument that Gragg had an honest but unreasonable belief it was necessary to defend himself in the restaurant incident from imminent peril posed by Junatanov. (*Flannel, supra,* 25 Cal.3d 668.) Even if the assault on Junatanov at the London-New York Shawarama Restaurant had been pre-planned by Gragg, there was nevertheless an aura of spontaneity to it wholly absent from the insidiously plotted and executed hospital incident, from which Gragg was acquitted despite somber indications from the record Gragg was a leading principal in that episode.

The trial court stated openly, candidly, and correctly that no heed would be paid to the charge on which Gragg was acquitted in imposing sentence. While recognizing Gragg had no prior record, the court nevertheless found him unsuitable for probation based on the court's personal assimilation of all the evidence from the trial as well as from the Penal Code section 1203.03 report which the court had received and considered, and the probation and sentencing report. The court mused aloud Gragg had spent 522 days in actual custody and had earned conduct credits of 267 days so that he had a total presentence credit of 800 days coming to him. The court rejected aloud the notion a low term sentence of 30 months was sufficient (i.e., half of the low term of 3 years or 18 months plus 1 year's enhancement for knife use).

It was the court's view voiced before hearing counsel's remarks that it was felt midterm and the knife use enhancement was an appropriate sentence.[2]

In response to the court's remarks the prosecutor cited the court to *People* v. *Moore* (1986) 185 Cal.App.3d 1005, 1018-1019 [230 Cal.Rptr. 237], in support of an argument for imposition of the upper term. *Moore* was urged by the prosecutor to stand for the proposition that where some felony and misdemeanor counts are tried in one action, and convictions are obtained only on the misdemeanor charges it is permissible for the sentencing judge to consider the evidence in the felony counts for purposes of imposing sentences on the misdemeanor convictions. Actually, the precise issue appealed in *Moore* was that the probation sentencing report on Moore referred to facts brought out in trial of the felony counts which was argued to be improper to use in the imposition of misdemeanor sentences. The *Moore* court rejected this argument by pointing out cases like *People* v. *Arbuckle* (1978) 22 Cal.3d 749, 754 [150 Cal.Rptr. 778, 587 P.2d 220, 3 A.L.R.4th 1171], and *People* v. *Zikorus* (1983) 150 Cal.App.3d 324, 333 [197 Cal.Rptr. 509], which allow a trial court to impose sentence even with "responsible unsworn or out-of-court information relative to the crime and to the convicted person's life and characteristics." ■ That information may include raw arrest data and information about arrests for which no convictions were obtained, so long as the information is accurate and reliable, and the judge imposing sentence is not misled into believing a mere arrest to be an actual conviction. *Moore* also cites *People* v. *Rhines* (1982) 131 Cal.App.3d 498, 509 [182 Cal.Rptr. 478], where it was noted in passing before addressing the point in issue here, that the trial judge in *Rhines* heard all the evidence on the count in which the defendant was acquitted from witnesses under oath. ■ The point made by *Rhines* equally applicable here is that: "Whatever facts the judge here considered were received . . . in a manner that could not have misled him for he knew that defendant was acquitted in II." (*Rhines, supra,* 131 Cal.App.3d at p. 509.) [And] "no prejudice . . . could have occurred as the result of the court's knowledge of the evidence on [the 'acquitted' count]." (*Id.* at p. 510.)

Before grappling with the points raised here urging sentencing error it should first be remembered that while a trial judge's function is to preside at

---

[2]The court stated: ". . . I do think the mitigating factors of no prior record and Mr. Gragg's [knife] use combined with all the other things I have just said all in appropriate. [*Sic.*] The appropriate sentence in this case." The transcription of the record appears muddled here. "In appropriate" is obviously not "inappropriate" and the words which follow and are set forth as a sentence in the transcript "the appropriate sentence in this case." is a fragmentary sentence with neither verb nor object. In light of these obvious clerical errors it is idle to speculate precisely what was said.

trial, rule on evidentiary objections and give the law to the jury, and the jury's function is to winnow findings of fact from all the evidence presented, apply the given law to the facts determined, and return a verdict, both judge and jury, identically here, perceived and assimilated the evidence which was presented. It is fatuous to suggest that evidence "which rings a jury's bell" does not also "ring the judge's bell" at the same time. CALJIC instruction No. 1.02, or a similar permutation of that instruction, has warned juries from time immemorial that stricken evidence must not be considered by them and that juries must treat stricken evidence as though they had never heard it. It can be speculated how successful juries are in adherence to this instruction but it is taken as an article of faith juries can effectively accomplish this task. This is expected and demanded of the laity from which jury panels are drawn—they are persons unschooled in the law. If the popular supposition is that lay persons as jurors have the capacity to ignore stricken evidence as CALJIC No. 1.02 requires, then it is almost an insult to suggest that a superior court judge, who must have a requisite 10 years' experience as a lawyer before becoming eligible to be a judge, cannot, in the imposition of sentence, distinguish between what a defendant was acquitted of or convicted of.

In this case the trial court clearly and expressly stated the hospital incident count of which Gragg was acquitted would play no part whatsoever in the sentencing choices. From the precedents previously noted, however, it must be further observed any jury must be convinced by the prosecution's evidence that a defendant is guilty beyond a reasonable doubt (CALJIC No. 2.90) and acquittal of a crime means nothing more or less than the fact the evidence presented by the prosecution on a particular charge did not meet that burden. It does not mean, most emphatically, that the evidence presented on any charge which results in an acquittal mysteriously vanishes from the scene or is consigned automatically to a purgatory of sorts from which no further utility may be drawn. Evidence equates with information. As the cited *Arbuckle, Zikorus,* and *Rhines* cases provide, any reliable information may be utilized by a trial judge in imposing a sentence, whether such information be from within or without the record of the case of the defendant to be sentenced.

The fact prosecution evidence does not prove the guilt of the defendant on a charge beyond a reasonable doubt does not rob that evidence of its informative value, nor does it make any information gleaned from such evidence unreliable. What is not prohibited by law is a judge's use of reliable information from any source from which to draw sentencing conclusions. What is prohibited is the unwarranted practice of imposing extra punishment on a defendant convicted of one charge based on a conclusion by the

judge the jury erred in acquitting the defendant on any companion charges. (*People* v. *Takencareof* (1981) 119 Cal.App.3d 492 [174 Cal.Rptr. 112].)

After the prosecutor properly cited to the trial court the *Moore* case, *supra,* 185 Cal.App.3d 1005, and after an opportunity to read and consider *Moore,* the trial court correctly concluded the totality of information received from all the evidence in the case was available to her to consider for sentencing purposes in the imposition of Gragg's sentence.

In reviewing the transcript of the sentencing hearing the impression emerges that superior advocacy by the prosecutor carried the day at the sentencing. This is in no manner disparaging or belittling of the remarkable trial results obtained by defense counsel, however. In the final analysis of the case it would seem Junatanov was portrayed to be so brutish, loathsome and despicable that the abundant evidence of guilt of the charged defendants was somehow ameliorated to the extent of Johnny's total acquittal on all three counts, and conviction of Gragg on count I only of the lesser included offense of attempted voluntary manslaughter. This was a prodigious feat of lawyering on the part of defense counsel.

To address the specific issues which are claimed to be sentencing error it should be pointed out the probation department's report on Gragg recommended the high base term and "knife enhanced" sentence of six and a half years, the sentence which was actually imposed. The report cited the aggravating factors were (1) great violence and threat of great bodily harm disclosing a high degree of cruelty and viciousness; (2) the victim was particularly vulnerable; (3) the planning, sophistication or professionalism with which the crime was carried out indicates premeditation. One mitigating factor was cited—the defendant had no extensive prior arrest history.

As legally required, the trial court stated the reasons relied upon for imposition of the high term. In quoting the trial court's remarks numerical reference to the sentencing rules in the California Rules of Court are parenthetically inserted. The trial court stated: "To summarize briefly, the crime involved is violent. (414(c)(1); 421(a)(1).) It involved the use of deadly weapon. (414(c)(3).) You had a particularly vulnerable victim. (414(c)(2).) There was careful planning involved, (414(c)(5)) and while the crime was not sophisticated or professional in any sense of the word, it was carefully planned, and there was substantial premeditation. (414(c)(1).) For all of those reasons plus the comments made earlier the high term is justified."

The court previously noted the only mitigating factor was Gragg's lack of a prior criminal record and that "the circumstances in aggravation so far outweigh the single circumstance in mitigation as to justify high term."

Defendant's argument the hospital incident was used to invoke a high term sentence, although Gragg had been acquitted on that count, is obviated by the unstated but apparent avoidance by the trial court of citing rule 421(a)(5) for the inducement of Vieweg into participation in the hospital incident; and 421(a)(5) using or involving Vieweg as a minor in the commission of the hospital affray on Junatanov.

Junatanov's particular vulnerability in the restaurant incident might be questioned, just as it cannot be questioned seriously in the hospital incident, but even by "eliminating that reason" from the thinking of this court, there still remains a far heavier tilt of aggravating circumstances over mitigating circumstances to be considered. There is therefore substantial evidence in the record before this court to support each sentencing rule relied on by the trial court, with the exception of the "particular vulnerability" of Junatanov in the restaurant incident. ■ "The power of a reviewing court in determining the sufficiency of the evidence to support the conclusion of the jury or the findings of the trial court, begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support such conclusions or findings." (5 Cal.Jur.3d, Appellate Review, § 536, p. 232.)

■ The simple process of stating a plurality of citable sentencing rules either in aggravation or mitigation is a disfavored way of determining a sentence. The requirement imposed on a trial court is to give voice through a stated weighing process on the record the reasons why chosen circumstances mitigate or aggravate without necessary regard to the fact in a given case there may be a greater number of one kind of such factors than the other. The trial court undertook just such a process in reaching the conclusions made in this case.

Gragg complained the maximum fine of $10,000 imposed under Government Code section 13967, subdivision (a) is excessive. *People* v. *Romero* (1985) 167 Cal.App.3d 1148, 1156 [213 Cal.Rptr. 774], seems to say the trial court need not specify reasons for imposing any amount of fine selected between the $100/$10,000 parameters provided in section 13967, subdivision (a). Only when the minimum fine of $100 is waived does it become necessary to state reasons for the waiver.

■ Notwithstanding, the trial court was mandatorily required by the statute itself to consider "any relevant factor" including but not limited to the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant, . . . and the extent to which others have suffered loss. Psychological as well as pecuniary loss may be considered. *People* v. *Wyman* (1985) 166 Cal.App.3d 810, 816

[212 Cal.Rptr. 668], provides "[i]n the absence of a clear showing of abuse, the trial court's sentencing discretion will not be disturbed on appeal. (*People* v. *Giminez* (1975) 14 Cal.3d 68 [120 Cal.Rptr. 577, 534 P.2d 65] . . . .)" It was reported in the probation and sentencing report Gragg claimed to have been the beneficiary of a trust fund in Oklahoma, and that he was not impecunious and the trial court so noted in imposing the $10,000 fine. Displeasure voiced by Gragg over the $10,000 fine does not equate with abuse of discretion by the trial court in imposing such fine.

Further direct attention need not be paid to Gragg's claim of sentencing error in light of the conclusion reached that substantial evidence exists in the record to affirm the trial court's conclusion the circumstances in aggravation outweigh those in mitigation, thus justifying imposition of the sentence Gragg received.

The judgment is affirmed.

Lucas, P. J., and Ashby, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 15, 1990.