Filed 2/25/13  P. v. Hurtado CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>HUGO MARQUEZ HURTADO,<br><br>  Defendant and Appellant. | F062333<br><br>(Super. Ct. No. BF134554A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Hugo Marquez Hurtado was convicted of raping and battering his girlfriend, and then subjecting her to criminal threats and trying to dissuade her from

testifying. He was also convicted of resisting arrest. In this appeal, he argues that the exclusion from evidence of a recording of a telephone call he made to the victim from jail was prejudicially erroneous; that the trial court abused its discretion when it imposed the upper term for the rape conviction; that either the sentence for making a criminal threat or the sentence for attempting to dissuade a witness should have been stayed under Penal Code section 654; and that there was a material variance between the information and the proof adduced at trial for the attempted dissuading charge. We reject each of these contentions. We agree with the People, however, that the trial court erred when it imposed a sentence of one-third of the middle term for trying to dissuade a witness. By the express terms of Penal Code section 1170.15, the full middle term must be imposed for that offense. We remand for resentencing on that count and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORIES

The victim, Alma P., lived with her young daughter in a bedroom of the home of her older sister, Sarah P. On the morning of November 15, 2010, Sarah and her husband went out to go shopping and pay bills. Sarah returned around noon and found Alma's daughter crying outside Alma's bedroom door. As she was talking to the child, Sarah looked through a window and saw a light-skinned, shirtless man outside, holding a telephone to his ear and jumping over the fence, out of the yard and into the street. Sarah called to Alma, but Alma did not open the bedroom door, so Sarah unlocked the door with a key and went in. She found Alma's room and bed in a disorderly condition, which was unusual. Alma was in the closet, crying and covering her face with her hand, wearing only a brassiere and unbuttoned jeans. Her lips were swollen and bleeding. She told Sarah that Hurtado had hit her. She also said Hurtado claimed he planted drugs in the house and would cause her daughter to be taken away by reporting the drugs to the authorities if she called the police.

The telephone rang a number of times while this conversation was happening. Sarah eventually answered. A man's voice said, "Alma, if you call your mother—the

2.

police, I swear that you will not be alive tomorrow, nor your fam—nor you or your family. I'm going to cut your throat." Sarah said she was Blanca (her nickname), not Alma, and hung up.

Over Alma's objection, Sarah called 911. She told the dispatcher that her sister's boyfriend came through the window and beat her sister, and then threatened to kill her if she called the police. She gave the dispatcher Hurtado's name, description, and the location of his house, which was two or three doors away from Sarah's house.

The telephone at Sarah's house continued to ring. When it stopped ringing, Alma's cell phone would ring. Then Alma's cell phone would stop and the house phone would ring again. Sarah answered again, and the same male voice said, "Blanca, I'm Hugo. I love Alma and I did not hit her." The same person called more than 10 additional times. Sarah sometimes answered, and Hurtado said incoherent things.

Police officers arrived. While the officers were at the house, Alma took a phone call from Hurtado. An officer took the phone from Alma and told Hurtado he could come to the house to tell his side of the story. Hurtado did not come.

Alma was taken to a hospital to be examined. While she was there, a detective interviewed her. Alma told the detective that Hurtado was her boyfriend and that she had been attempting to break up with him for some time. At 11:00 p.m. on November 14, the previous night, Hurtado entered her room and sexually assaulted her. He spent the night and left when she got up to take her daughter to school about 6:00 a.m. About 11:00 that morning, Hurtado returned, entering through the window. He accused her of having an affair and slapped her. Then he forcibly removed her clothes and forcibly had sexual intercourse with her. She told him she did not want to have sex and tried to push him away, but he held her hands above her head and pinned her on the bed as he raped her.

Alma also told the detective some of the background of her relationship with Hurtado. She had become friends with him in May 2010 and was in love with him soon after. After about a month, however, he became possessive and abusive. When she tried to break up with him, he said he would plant drugs in her room in order to have her

3.

daughter taken away. He also stole her passport and her daughter's birth certificate. While at the hospital, Alma told a nurse who examined her that Hurtado hit her, threatened her, and forced her to have sex with him.

While Alma was speaking to the detective, Hurtado sent a text message to Alma saying, in Spanish, "nothing better happen to me or you'll pay." Alma showed the message to the detective.

Officers went to the house identified by Sarah to look for Hurtado. A resident admitted the officers and they found Hurtado hiding in a closet. Hurtado failed to comply with their orders to display his hands, so the officers seized him. He struggled as the officers wrestled him to the floor, placed his hands behind his back, and handcuffed him.

The district attorney filed an information charging Hurtado with six counts: (1) rape by force or fear (Pen. Code, § 261, subd. (a)(2)),[1] (2) first degree burglary (§ 460, subd. (a)); (3) making a criminal threat (§ 422); (4) preventing or dissuading a witness from testifying (§ 136.1, subd. (a)(1)); (5) domestic battery (§ 243, subd. (e)(1)); and (6) resisting arrest (§ 148, subd. (a)(1)). The information alleged that Hurtado committed the offense in count 1 during the commission of a burglary. (§ 667.61, subd. (d)(4).)

At trial, Alma testified that Hurtado became physically aggressive toward her a few months after the beginning of their relationship. He was constantly jealous. He slapped her four or five times. On one occasion, he placed his hand on her throat and applied pressure. Alma decided to end the relationship, but Hurtado threatened her and insisted that she would be with him as long as he wanted. He said he had planted drugs in her house and would tell the police to come and search for them and take her daughter away. He stole her passport, her birth certificate, and her daughter's birth certificate. She thought he planned to sell them.

Alma testified that on the night of November 14 and again on the morning of November 15, Hurtado entered her room by climbing through the window. Hurtado had

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

been entering the house that way throughout their relationship because Alma was attempting to conceal the relationship from her sister. On November 14, Hurtado was angry when he entered around 11:00 p.m. because Alma had failed to answer his phone calls. He wanted to have sex with her, but she said no and told him she no longer wanted to be with him. He took her clothes off and had sex with her against her will. He left around 5:00 or 6:00 a.m. on November 15 and returned around 10:00 or 11:00 the same morning. She did not call the police while he was gone because she feared Hurtado. He called and sent numerous text messages before he returned, including a text message saying "mother fucker, answer the phone." When Hurtado came in, he was again angry at Alma for not answering the phone. He tried to take her cell phone. They struggled. Alma pushed Hurtado and Hurtado pulled at Alma's clothes, tearing her shirt. She told him she would no longer tolerate his behavior and would call the police. He said he would call the police on her. She made a small tear in his shirt, which he then tore more himself. She bit him. He pushed her onto the bed and removed her clothes. She said she did not want to be with him, and he slapped her face and told her to calm down. He forced her to have intercourse.

Afterward, Alma told Hurtado to leave because she had to pick up her daughter at school. Before leaving, however, Hurtado forced Alma to have intercourse with him again.

After Hurtado was arrested, he called Alma 38 times from jail. A recording of one of these calls, placed on November 24, 2010, was played for the jury. During the call, Alma and Hurtado said they loved each other. They blamed each other for Hurtado's being in jail. They discussed Alma's pregnancy with Hurtado's child. Hurtado told Alma to recant everything she told the police so that the charges against him would be dropped. She promised she would, but had misgivings:

> "[Hurtado]: You have to help me get out [of] here. You just have to deny everything. [¶] … [¶] I want you to tell me right now that you're going to say what I'm telling you right now. I just don't want you to give

5.

me the boot. You need to say that you lied, that nothing is true, that I didn't rape you, that I didn't abuse you …

"Alma: I know.

"[Hurtado]: … and that I didn't steal anything from you.

"Alma: I'm going to say that you didn't steal it, that you took it from me, but returned it later.

"[Hurtado]: Okay. I took it, but I did not robbed [*sic*] it from you. But I didn't steal it. And that I didn't force you to have sex. And that I didn't hit you. Okay? Please.

"Alma: Look, like I told you, I'm going to say that. I'm going to say that.

"[Hurtado]: Okay. And I don't …

"Alma: I don't know why I should lie. I shouldn't be lying. But I am telling you that the evidence speaks more by itself. And then don't blame me.

"[Hurtado]: What evidence?

"Alma: Uh, uh, well, I can't say that … they saw everything that I have right here.

"[Hurtado]: They what?

"Alma: All the bruises that you … that I have.

"[Hurtado]: Well, you fell, remember? [¶] … [¶]

"Alma: [I]f something happens, Hugo, don't blame me for it …

"[Hurtado]: No, no, no …

"Alma: … cause you're the one who did it. Not me. Understand me. How many times did I beg you? How many times did I beg you to please … ? [¶] … [¶]

"[Hurtado]: When? Hey, doesn't [*sic*] hold on to that if something happens … just say that you lied. And they don't have a reason to do anything to me because my record is clean. They won't deport me to Mexico. Okay? [¶] … [¶][L]ove, if you say, hey, if you say that I didn't rape you because you know is not true. If you say that, if you say that I

6.

didn't rape you, then they don't have a reason to file charges on me and I will get out soon. You know that is not true. And they don't have a reason to have me here. It's true. It's already enough with these ten days. Okay?

"Alma: Hugo, I have to hang up because my sister is knocking.

"[Hurtado]: Okay. But you tell them … are you going to help me?

"Alma: I'm going to do it. I'm going to do everything possible. Understand that. I am going to do it. [¶] … [¶]

"[Hurtado]: Okay. Drop the charges. Drop the charges. Just deny.

"Alma: I'm going to do what I can.

"[Hurtado]: Drop charges. [¶] … [¶] You're pregnant because we had sex every day.

"Alma: What?

"[Hurtado]: Yes. If they say that you … no, no, we had sex every day. It's obvious. My love, do it for the son that we are going to have. Okay? And for the love that I have for you. Okay? Because the true [*sic*] is that I'm really in love with you. [¶] … [¶] … That I didn't rape you, I didn't hit you, I didn't steal from you, and that you made all that up in a moment of anger. Okay? Only that.

"Alma: But I'm telling you what if they put me in jail for that …

"[Hurtado]: No. Okay, so then if I see that they're going to put you in jail … why will they put you in jail? My love, my love, don't be like that. Just do it. And once you talk I'll go out. And whenever you let me see the child I'll see him. Okay? And I will help you with what I can. Okay?

"Alma: Okay. But she is calling me. Please.

"[Hurtado]: But drop the charges. Tell them that you made that up in a moment of anger. Okay?"

Alma testified that during several of Hurtado's calls from jail, she told Hurtado that the sex they had on the night and morning in question was consensual. She testified that this was not true, however, and that she said it only because he wanted her to do so. The defense proffered a recording of another jail call, placed November 30, but the court ruled that it was inadmissible. We will discuss that call later in this opinion.

Hurtado testified in his own defense. He said he entered Alma's room on November 14 and 15 at her invitation and the sex they had on those dates was consensual. She never said no. They began to argue only after the second time they had sex on November 15. The argument was about Hurtado's plan to go to Mexico. He pushed her against the wall after she slapped him, and he slapped her and tore her shirt after she tore his shirt. He admitted he made her lip bleed and caused bruises on her arm and back. He denied making threatening calls to Alma's house and denied saying he would plant drugs in Alma's room and then call the police to take away her daughter. He had only expressed concern that someone would call the authorities when Alma came to his house in the middle of the night and her daughter woke up and wandered into the street alone. He said his texts and phone calls were attempts to make her tell the truth by saying he did not rape her. During the phone calls he made from jail, she said she had sex with him voluntarily on November 14 and 15. He admitted he sent Alma a text saying she would pay if anything happened to him, but said he "didn't say it as a threat." He meant that his family would be upset with her. He also admitted he failed to comply when the officers found him and told him to show his hands. He denied ever telling police he forced Alma to have sex.

Detective Herman Caldas gave rebuttal testimony. He said that when he interviewed Hurtado after his arrest, Hurtado said that the second time he had sex with Alma on November 15, Alma told him to stop. Hurtado also told Caldas, "maybe I did force her a little."

The jury found Hurtado not guilty of burglary and guilty of the remaining charges. It found not true the allegation that Hurtado committed the rape during the commission of a burglary.

The court imposed a sentence of nine years four months. This sentence was composed of eight years, the upper term, for count 1 (rape), plus eight months each, equal to one-third of the middle term, for count 3 (criminal threat) and count 4 (dissuading a

witness).  For counts 5 (battery) and 6 (resisting arrest), the court imposed sentences of six months each, concurrent with the sentences for the other counts.

## DISCUSSION

### I.      Exclusion of Recorded Telephone Conversation

Hurtado contends that the trial court erred when it excluded the recording of the November 30 telephone conversation between him and Alma.  We hold that any error was harmless.

The court asked defense counsel to explain on the record why she thought the November 30 conversation was relevant.  Counsel said:

> "Your Honor, this conversation between Alma [P.], the alleged victim, and my client, Hugo Marquez Hurtado, and in this she indicates that she had sex with Hugo voluntarily.  She made this statement that it was voluntary on her own prompting.  Mr. Hurtado did not prompt her to say that it was voluntary.  I understand that she testified during her direct and perhaps cross-examination or maybe it was cross-examination that she said that she made those statements.  However, I want the jurors to see that it is not at the request of Mr. Hurtado since … the recording that [the prosecutor] played today [i.e., the November 24 call] makes it seem like Mr. Hurtado is asking her to come in and tell lies or not tell the truth.  So I want them to see that it's at her own prompting that she says that."

The portions of the transcript of the November 30 conversation that arguably support Hurtado's trial counsel's description are as follows.  In response to Hurtado's repeated assertions that Alma ruined his life, Alma said she tried to explain to the authorities that she was "with him" "voluntarily," but they did not accept her explanation:[2]

> "[Hurtado]:  … Thanks, you ruined my life, thanks.
>
> "Alma:  But it wasn't me that called the cops.  It wasn't me, understand.
>
> "[Hurtado]:  But, you placed the accusations, that—no, no, no.  I—

_____

[2]The transcript is written in Spanish, the language in which the conversation was conducted, with English translations inserted.  The original Spanish is omitted here.

9.

"Alma: It wasn't me, listen. They told me—

"[Hurtado]: Thanks, I owe it to you.

"Alma: No, no you know that's not true, [that] it's not my fault, why are you doing this to me—

"[Hurtado]: (Inaudible) I will go to trial.

"Alma: No! I—I, I told them how it happened and they say that's rape. And I told them I was with, (inaudible) with you voluntarily. And I tell them, but they don't want to believe, they say because—

"[Hurtado]: (Inaudible) I don't give a mother—

"Alma: No, understand (inaudible)—

"[Hurtado]: (Inaudible) ruined my life—

"Alma: No! (Crying.)

"[Hurtado]: Thanks to you—

"Alma: And they told me that if you keep calling me, it was gonna be worse on you, that because the Judge already told you not to call me. (crying)—

"[Hurtado]: You know that you just broke my heart—

"Alma: (Crying) [D]on't tell me that, please, I don't want anything to happen to you. I already told them, but they say that if not they are going to put me in jail.

"[Hurtado]: (Inaudible).

"Alma: No!

"[Hurtado]: Thanks to you.

"Alma: No! Please.

"[Hurtado]: Thanks, I owe it all to you.

"Alma: (Crying) No, I told them that I love you, please—

"[Hurtado]: (Inaudible).

"Alma: But I already told them.

10.

"[Hurtado]:  (Inaudible) you should have thought of that from the beginning, you just ruined by life.

"Alma:  No!  (crying)

"[Hurtado]:  (Inaudible).

"Alma:  (Crying)  Don't tell me that, please.

"[Hurtado]:  You don't know how much it hurts.

"Alma:  (Crying)  No, I don't want to.

"[Hurtado]:  (Inaudible).

"Alma:  Please (crying).

"[Hurtado]:  (Inaudible).

"Alma:  I told them that no—that I—I already told them—

"[Hurtado]:  (Inaudible).

"Alma:  (Inaudible)  They say that if you refuse they will give you more time, if they prove that it's true, that even if I don't want—

"[Hurtado]:  No, I never abused you—

"Alma:  I told them that I—

"[Hurtado]:  (Inaudible) thanks to you, Alma.

"Alma:  No!  They say that is rape, they tell me, and I tell them that I was voluntarily [*sic*].

"[Hurtado]:  (Inaudible) thanks.

"Alma:  Understand!  Please, that was I did not [*sic*] fault you, understand—

"[Hurtado]:  Don't worry, Alma, hopefully that kid you're going to have won't be mine, hopefully.

"Alma:  (Inaudible) helpless, because if it is yours, it's no one else's—

"[Hurtado]:  (Inaudible).

11.

"Alma: That's what you believe, that's what you think (inaudible) you're always going to think bad—

"[Hurtado]: (Inaudible) so much to have met you (inaudible)—

"Alma: (Crying) (Inaudible) And you too, you ruined my life (inaudible) you did me damage—

"[Hurtado]: I made [*sic*] you no harm.

"Alma: (Inaudible) you did me damage, you made me a baby (inaudible)—

"[Hurtado]: (Inaudible).

"Alma: Why do you make me feel bad, it wasn't me that called the police, it wasn't me! Understand!—

"[Hurtado]: (Inaudible) you think I feel good in here (inaudible)—

"Alma: (Crying)—

"[Hurtado]: Why did you do it to me, Alma?

"Alma: It wasn't me, please. (Crying) [P]lease—

"[Hurtado]: (Inaudible) you ruined my life.

"Alma: (Crying).

"[Hurtado]: (Inaudible) they are going to send me … why did you do it to me?

"Alma: (Crying) Understand please! It wasn't me!

"[Hurtado]: (Inaudible) Alma.

"Alma: (Crying) I don't want anything to happen to you, I already told them, please! (Crying.) Please! (Crying)—

"[Hurtado]: (Inaudible).

"Alma: I didn't, I didn't—(crying) because if you refuse, they are going to give you more, and if you don't refuse they will give you less—

"[Hurtado]: (Inaudible) I will not plead guilty—

"Alma: (Inaudible) I told them—

12.

"[Hurtado]: (Inaudible) I will not plead guilty, they can keep me here for life, I will not plead guilty. Because I'm not, you know it, I never raped you—I never threatened you. What you accused me, I owe it all to you and your sister, okay. [¶] … [¶] Lament the day that I met you, you were my ruin in everything.

"Alma: (Crying).

"[Hurtado]: (Inaudible).

"Alma: (Crying). I told them that I was with you voluntarily; you don't understand that they have evidence (crying) that it's rape.

"[Hurtado]: (Inaudible). You accused me unfairly, without it being true. But I'm going to trial.

"Alma: (Crying).

"[Hurtado]: (Inaudible) because I'm not, I'm not, I'm not, and that they can show—

"Alma: (Inaudible) for the evidence and find you guilty—

"[Hurtado]: Abused of you? Abused of you? Let's see tell me here on the phone, let's see did I abuse you? I never abused you!

"Alma: No I only told them what happened and they say that it's rape. And I tell them that I was with you voluntarily.

"[Hurtado]: (Inaudible).

"Alma: I told them. How do you want me to tell them, understand, how—how do I tell them I was with you voluntarily, don't you know what that is? And they don't understand. They say it is (inaudible) guilty even if you give [*sic*] innocent. They are going to blame you more years [*sic*] if you declare—

"[Hurtado]: I didn't do it, love.

"Alma: (Crying) I don't want. I don't—I told them—because they think that I cry when—that I'm crying because I'm scared of you. I told them that I'm not scared of you, that if you're going to do anything to me you will do it, but I love you that's why I don't want you to go through— [¶] … [¶] I told them that because you still refused (inaudible) they are your charges, and that—that they told you not to call me—they are charges they will put on you.

13.

"[Hurtado]:  Doesn't matter if they put them, but I want you to say the truth (inaudible).  [¶] … [¶]

"Alma:  (Inaudible)  I went willing to tell them to please not harm you that I need them to help you; that I don't want them to put you in jail, that please—that I was with you voluntarily.  [¶] … [¶] I didn't want this to happen, please.

"[Hurtado]:  But it happened, love, because your fault [*sic*].

"Alma:  That no, it wasn't me, understand!

"[Hurtado]:  (Inaudible) I thank your sister Blanca and you.  (Inaudible) I lost everything I had (inaudible).

"Alma:  You think that if I wanted to ruin your life (inaudible) I was going to be happy because you were there.

"[Hurtado]:  (Inaudible).

"Alma:  Understand—

"[Hurtado]:  (Inaudible).

"Alma:  Understand, I'm not like that, understand!  No, no, no, I'm not like that!  Because I love you, I've said it to everybody—everybody, the detective—to everybody that I love you, that I love you—

"[Hurtado]:  Love, you shouldn't have done this to me—

"Alma:  But it's them (inaudible) evidence—

"[Hurtado]:  (Inaudible) I don't care (inaudible) whatever detective I don't care (inaudible)—[¶] … [¶]

"Alma:  You want to see me tell Judge [*sic*]?  You want me to tell him there in front [*sic*], and for them to put me in jail?  And I'm going to tell them that, you want them to put me in?

"[Hurtado]:  They are not going to put you in.  Because you can tell them that you were mad (inaudible).

"Alma:  And, but, and the evidence that they took?

"[Hurtado]:  But I never did you—how many times have we done it, every day we did it—

14.

"Alma:  And yes, I told them that I had been with you in the night, but you too, look what you would do, Hugo, for what—[¶] … [¶]

"[Hurtado]:  (Inaudible) I will never fall in love with anyone again.

"Alma:  Please don't say that, please!

"Operator:  You have one minute left.

"Alma:  Please, Hugo!

"[Hurtado]:  Why did you do this to me?

"Alma:  Hugo, I didn't do it, please!  Hugo, understand!"

The prosecutor argued that the recording was inadmissible because it was hearsay not within any recognized exception.  In particular, it was not within the prior inconsistent statement exception because Alma testified that she told Hurtado during the postarrest phone calls that she "was with him voluntarily," so the proffered recording and the trial testimony were consistent with each other.

The trial court excluded the recording, explaining as follows:

"[L]istening to the testimony I've concluded—well, let me tell you what I listened to and what my rationale is.  The victim stated on the stand that she said it was, quote, unquote, voluntary, when she was talking about what had occurred on the phone.  And she admitted on the stand that she made the quote, unquote, voluntary statement.  [Hurtado] testified today that quote, I did not tell her to say that regarding the voluntary statement.  And the quote, unquote, voluntary again.  And he stated—[Hurtado] did—that the victim told him it was voluntary on the phone which corroborates what she said on the stand.  Therefore, it's this court's opinion that the evidence that wishes to be produced by the playing of the tape has already been introduced into evidence here in the court.  The victim admitted to doing it.  [Hurtado] stated that she had done it.  So I don't see how introduction of the audio tape would be relevant at this point since it's already been discussed by both parties with apparently an agreement as to that.  Therefore, I will not allow the tape to be played."

Hurtado now argues that the November 30 call was relevant as support for his consent defense and was admissible under the prior inconsistent statement exception (Evid. Code, § 1235) to the hearsay rule.  He says the statements in the November 30 call are inconsistent with Alma's trial testimony because in her testimony she said it was only

15.

to placate Hurtado that she told the authorities she consented; but in the November 30 call, she made the same declaration without prompting by him. He also argues that the call was admissible because it was necessary to make the November 24 conversation understood within the meaning of Evidence Code section 356. The People argue that Alma's statements during the November 30 call and her trial testimony were not inconsistent and that the November 30 conversation was not necessary to make the November 24 conversation understood.

We need not decide whether the November 30 call was admissible because any error in excluding it was harmless. Applying the harmless-error standard stated in *People v. Watson* (1956) 46 Cal.2d 818, we conclude that there is no reasonable probability that admission of the recording would have led to a better result for Hurtado. Hurtado argues that the beyond-a-reasonable-doubt standard of harmless error review of *Chapman v. California* (1967) 386 U.S. 18 applies because the exclusion of the evidence violated the federal Constitution. He says he was denied the opportunity to present a defense, in contravention of his Sixth Amendment right to a trial by jury and his Fourteenth Amendment right to due process of law. He is mistaken, however; at most, the ruling in question prevented him from presenting one item of evidence in support of his defense. Error of that kind does not violate the constitutional right to present a defense. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103.)

The November 30 call included Alma's statements to the effect that she told the police she had given her consent to sex with Hurtado on November 14 and 15. She made these statements in response to Hurtado's constant repetition of his view that she had ruined his life. The November 24 call included Alma's statements to the effect that she planned to tell the police the sex happened with her consent. In that instance, her statements were in response to Hurtado's insistence that she tell the police a story that would exculpate him. If the November 30 recording had been played for the jury, the jury would necessarily have regarded it in light of the November 24 conversation. In light of the November 24 conversation, Alma's November 30 statements were merely her

16.

confirmation that she had done as she promised on November 24 and her reaction to Hurtado's self-pitying comments. There is virtually no likelihood that if the jury had heard the November 30 conversation, it would have viewed in a different light Alma's testimony that she gave these assurances to Hurtado only to placate him and that in reality she did not consent to have sex with him on November 14 and 15. Instead, the November 30 conversation reinforces the impression given by the November 24 conversation that Alma's intention was to tell Hurtado what he wanted to hear, just as she said in her trial testimony. Therefore, it is not reasonably probable that the November 30 recording would have had an impact in Hurtado's favor, regardless of whether it had been admitted as a prior inconsistent statement under Evidence Code section 1235 or as context necessary to make the earlier conversation understood under Evidence Code section 356.

The general weakness of Hurtado's consent defense reinforces our conclusion that the November 30 recording would not have helped him. On November 15, Alma told three people that Hurtado forced her to have sex: Detective Caldas, the nurse at the hospital, and Alma's friend Gerardo Rodriguez. Her lip was bleeding and she had bruises. Hurtado fled Alma's house, made a death threat by telephone, sent a text message making another threat, and hid in a closet—all actions indicative of an acute consciousness of guilt. Later that day, when Caldas interviewed Hurtado, Hurtado maintained that the sex was consensual, but conceded that Alma told him to stop during sex and that he might have forced her. In light of all this, the November 30 recording would have done little to support Hurtado's position or undermine the prosecution's.

Hurtado argues that some of Alma's statements in the November 30 conversation contradicted and impeached her trial testimony on two other points: whether she ever spoke to Detective Caldas or the prosecutor about dropping the charges; and whether anyone ever told her she could go to jail if she changed her story. He also argues that the "whole impression and effect" of the November 30 conversation contradicts and impeaches her trial testimony because she willingly took the call instead of hanging up.

17.

These reasons for admitting the recording were not proposed by defense counsel at trial. Therefore, Hurtado's argument based on them is forfeited. (*People v. Saunders* (1993) 5 Cal.4th 580, 590; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1.) Even if the issue had been preserved, we would not find prejudicial error. For the reasons we have already stated, it is not reasonably probable that the November 30 recording would have caused the jury to reject Alma's testimony and accept Hurtado's instead.

## II. Imposition of Upper Term for Rape

Hurtado argues that the trial court abused its discretion by imposing the upper term for count 1. As we will explain, Hurtado forfeited this argument by failing to raise it in the trial court, and he has not shown that his trial counsel rendered ineffective assistance by failing to raise it.

At the sentencing hearing, the trial judge explained his rationale for imposing the upper term for rape. He began by addressing defense counsel's argument that a lesser sentence should be imposed partly because three of the convictions were strikes under the three strikes law, and the possible future consequences of this were already a severe form of punishment and a deterrent. Then he went on to discuss aggravating and mitigating circumstances.

> "Just one thing I wanted to address. [Defense counsel], you stated [Hurtado]'s strikes will follow him for the rest of his life. Based on his demeanor and actions in court, I doubt that's going to affect him.
>
> "However, the victim in this case was raped in her own home, and that will follow her for the rest of her life, and quite possibly never recover from it.
>
> "Circumstances in aggravation and mitigation here—or circumstances in mitigation, [Hurtado] has no prior criminal record.
>
> "Circumstances in aggravation, the manner in which the crime was carried out indicates planning, sophistication and professionalism in that [Hurtado] apparently conducted surveillance of the victim's residence, observing the presence of family or law enforcement, and used a less visible, unsecured means of entry. [¶] … [¶]

18.

"The victim was particularly vulnerable in that she was alone in her home when the offense occurred. [¶] … [¶]

"While acknowledging [Hurtado]'s relatively young age and lack of criminal record, it's felt the trauma which he caused the victim and her family is serious enough to warrant a significant sanction.

"Let the record reflect he dodged a significant sanction by finding— the jury finding him not guilty of the 667.61, sub (d), sub (4).

"Anything less than a substantial prison sentence here would negate his egregious conduct.

"An examination of the circumstances in aggravation and mitigation, it is felt that the lone mitigating factor is not of sufficient weight to overcome the totality of the circumstances in this case.

"In examining [Hurtado]'s conduct in the instant offense, it is felt the upper term is appropriate, and it will be ordered."

Hurtado now contends that each of the factors the court mentioned—planning, sophistication and professionalism, vulnerability of the victim, and the notion that Hurtado "dodged a sanction" because the jury found the rape was not committed during his commission of a burglary—was improper and erroneous. Although Hurtado's trial counsel argued for a more lenient sentence, however, she did not contend that any of the factors the court relied on were improper. We conclude, therefore, that the issue was not raised in the trial court and has not been preserved for appeal.

Hurtado argues that his trial counsel rendered ineffective assistance in contravention of the Sixth Amendment when she failed to raise this issue. To establish ineffective assistance of counsel, the defendant must show that counsel's performance "fell below an objective standard of reasonableness," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694; see also *People v. Hester* (2000) 22 Cal.4th 290, 296.) It is not necessary in every case, however, to determine whether counsel's challenged action was professionally unreasonable. If the reviewing court can resolve the ineffective assistance claim by

19.

proceeding directly to the issue of prejudice—i.e., the issue of whether there is a reasonable probability that the outcome would have been different absent counsel's challenged actions or omissions—it may do so. (*Strickland v. Washington*, *supra*, at p. 697.)

In this case, there was no ineffective assistance of counsel because it is not reasonably probable that Hurtado would have obtained a more favorable result if his counsel had raised the issue. Given the overall tenor of the trial court's remarks, there is no reasonable probability that it would have agreed with Hurtado and imposed a lesser sentence if Hurtado had made the necessary objection. Further, if he had made the necessary objection and the trial court had imposed the same sentence, we would affirm, for the three factors the court relied on were not improper.

We review the trial court's selection of the upper term for abuse of discretion and must affirm unless the defendant makes a clear showing that the choice was arbitrary or irrational. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978; *People v. Lamb* (1988) 206 Cal.App.3d 397, 401.) The court's findings of aggravating circumstances are reviewed for substantial evidence. (*People v. Gragg* (1989) 216 Cal.App.3d 32, 46.)

The planning, sophistication and professionalism factor was supported by substantial evidence. Although there had been a preexisting arrangement by which Hurtado entered Alma's room through the window, Alma's testimony supported the conclusion that she did not want him to enter at the time when he raped her. The court reasonably could find that at the time of the offense, Hurtado exploited the arrangement for surreptitious entry for purposes Alma never intended, and that this supported the planning, sophistication and professionalism factor.

The particularly vulnerable factor also was supported by substantial evidence. As Alma's romantic partner, Hurtado occupied a position of trust with respect to her. She had given him access to her home. Her guard was thus lowered, and he exploited this vulnerability to rape her.

The court's reference to the jury's not-true finding on the section 667.61 special circumstance might appear to involve an incursion into the jury's province, but in reality that reference is acceptable under *People v. Towne* (2008) 44 Cal.4th 63 (*Towne*). In that case, our Supreme Court held that the trial court did not err when it imposed sentence partly on the basis of facts the jury implicitly found not true when it acquitted the defendant of related offenses. "Nothing in the applicable statute or rules suggests that a trial court must ignore evidence related to the offense of which the defendant was convicted, merely because that evidence did not convince a jury that the defendant was guilty beyond a reasonable doubt." (*Id.* at pp. 85-86.) The use of those facts also did not implicate constitutional concerns, at least where (as here) "other aggravating factors rendered defendant eligible for the upper term." (*Id.* at p. 86.)

In the present case the jury did not merely imply that Hurtado did not commit the rape during the commission of a burglary; rather, it both acquitted Hurtado of burglary and rejected the allegation that he committed the rape while committing a burglary. The principles of *Towne* still apply, however. The basic rationale for the holding in *Towne* is that the jury's findings are based on the beyond-a-reasonable-doubt standard of proof, while the court's findings of sentencing factors are based on the preponderance-of-the-evidence standard. (*Towne*, *supra*, 44 Cal.4th at p. 86.) The jury's acquittal and not-true finding in this case therefore do not necessarily conflict with the court's use of the underlying burglary facts to support the upper term.

Hurtado attempts to distinguish *Towne* by arguing that the court was not merely relying on the burglary facts. He points out that the court said Hurtado "dodged" a sanction, and he argues that this means the court intended to avoid the leniency that could have resulted from the jury's findings. Hurtado says this contravenes the principle that a sentencing court must not penalize a defendant for exercising his right to a jury trial, as set forth in a number of cases, including *In re Lewallen* (1979) 23 Cal.3d 274. In that case, the defendant rejected an offered plea deal and went to trial; the jury acquitted him of three out of four charged offenses. (*Id.* at p. 276.) During a discussion about

sentencing, the trial judge said the defendant was "'not going to have the consideration he would have had if there was a plea.'" (*Id.* at p. 277.) Our Supreme Court held that the court's sentencing discretion was improperly influenced by the defendant's decision to exercise his right to a jury trial. (*Ibid.*)

The record does not support Hurtado's view that the trial court did something similar in this case. The reference to dodging a sanction is most reasonably interpreted to mean that the court thought the evidence of burglary was strong enough to be an aggravating factor for sentencing purposes even if it was not strong enough to support a true finding on the section 667.61 allegation. There was evidence from which the court could reasonably infer, under the preponderance standard, that even though Hurtado had received permission to enter through the window in the past, he did so contrary to Alma's wishes at the time in question, and did so with the intent to commit crimes against her once inside. Nothing in the court's remarks supports an imputation of an intention to punish Hurtado for going to trial instead of accepting a plea bargain.

For all these reasons, Hurtado has not shown that his counsel's failure to object to the trial court's recitation of sentencing factors amounted to ineffective assistance of counsel.

## III. Court's Decision Not to Apply Section 654 to Counts 3 and 4

Hurtado argues that the trial court should have applied section 654 to stay the sentence for count 3 or count 4 because the convictions for each of those counts were based on the same two acts: the phone call in which Hurtado told Sarah he would cut Alma's throat and the text message in which he told Alma she would pay. We conclude the two acts support two separate punishments.

Section 654 provides, in part, as follows:

> "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (*Id.*, subd. (a).)

22.

This statute bars double punishment not only for a single criminal act but for a single indivisible course of conduct in which the defendant had only one criminal intent or objective. (*People v. Bauer* (1969) 1 Cal.3d 368, 376; *In re Ward* (1966) 64 Cal.2d 672, 675-676; *Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled on another point by *People v. Correa* (2012) 54 Cal.4th 331, 334; *People v. Brown* (1958) 49 Cal.2d 577, 591.) We review under the substantial evidence standard the court's factual finding, implicit or explicit, of whether or not there was a single criminal act or a course of conduct with a single criminal objective. (*People v. Coleman* (1989) 48 Cal.3d 112, 162; *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1408.) As always, we review the trial court's conclusions of law de novo. (*Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1687.)

Hurtado argues that section 654 applies here because the two threats were parts of an indivisible course of conduct with the single objective of persuading Alma not to seek his prosecution.

We agree with the People's contention that each threat was sufficient to support one offense or the other by itself, and that there was sufficient evidence to support the trial court's implied finding that the two threats were divisible from each other. For purposes of section 654, offenses are divisible if they are "temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Hurtado's threat to cut Alma's throat happened shortly after Sarah found Alma in the closet, before the police arrived. Alma received Hurtado's threatening text message later, while she was telling her story to an officer. Hurtado certainly had time between the two acts to reflect on his intention to threaten Alma. The second threat represented his decision to renew that intention.

Hurtado says the People's argument on appeal is inconsistent with the prosecutor's argument at trial. The prosecutor argued to the jury that each of the two counts was

23.

supported by both of the threats. Hurtado asserts that the People therefore are "judicially estopped" from arguing that the two threats support separate punishments.

The two arguments are not inconsistent. The prosecutor was correct in arguing that both threats support count 3 and count 4. At the same time, the People are correct in their argument that the two threats were divisible from each other under section 654; each one is sufficient on its own to support either offense, and Hurtado had time to reflect and renew his intention after the first and before the second. The situation is similar to one in which section 654 does not require a stay because, although two convictions were based on a single act, the act had multiple victims. (*People v. Miller* (1977) 18 Cal.3d 873, 885-886, overruled on other grounds as stated in *People v. Oates* (2004) 32 Cal.4th 1048, 1067, fn. 8; *People v. Young* (1992) 11 Cal.App.4th 1299, 1311-1312.) The multiple-victim exception applies even if the prosecution discusses all the victims in its arguments in favor of each count. There is no requirement that the prosecution artificially assign one victim to each count. Here, similarly, the prosecution's failure artificially to designate one threat for each count did not require the trial court, and does not require us, to view the two threats as indivisible for purposes of section 654.

## IV.    Full Middle Term Required for Count 4

The People argue that the trial court was required to impose the full middle term, not one-third of the middle term, for the consecutive sentence imposed for count 4. They request that we remand for resentencing. The People are correct.

Section 1170.15 addresses this situation explicitly:

> "Notwithstanding subdivision (a) of Section 1170.1 which provides for the imposition of a subordinate term for a consecutive offense of one-third of the middle term of imprisonment, if a person is convicted of a felony, and of an additional felony that is a violation of section 136.1 or 137 and that was committed against the victim of, or a witness or potential witness with respect to, or a person who was about to give material information pertaining to, the first felony …, the subordinate term for each consecutive offense that is a felony described in this section shall consist of the full middle term of imprisonment for which a consecutive term of imprisonment is imposed …."

24.

Hurtado does not deny that section 1170.15 requires the full middle term for a violation of section 136.1 when that term is subordinate to a primary term for a crime also committed by the defendant and about which the defendant attempted to dissuade a witness from testifying. He does argue, however, that the rule of section 1170.15 should not be applied here because there was an "implied due process prerequisite" to allege section 1170.15 in the information. Yet the cases he cites do not stand for any such requirement. (*People v. Mancebo* (2002) 27 Cal.4th 735, 743 [§ 667.61 special circumstances must be pleaded and proved]; *People v. Hernandez* (1988) 46 Cal.3d 194, 197, overruled on other grounds by *People v. King* (1993) 5 Cal.4th 59, 78, fn. 5 [§ 667.8 special circumstance must be pleaded and proved].) Section 1170.15 does not impose additional punishment based on facts beyond those required for conviction of the underlying offense, so there is no reason why a pleading-and-proof requirement would apply.

We will remand to allow the trial court to resentence Hurtado on count 4.

## V.      Variance Between Information and Proof

In his reply brief, Hurtado points out for the first time that the offense charged in count 4, dissuading or preventing a witness from testifying in violation of section 136.1, subdivision (a)(1), is not actually the offense that was proved at trial. Alma testified, so the correct offense was *attempting* to dissuade or prevent a witness from testifying, a violation of section 136.1, subdivision (a)(2). Hurtado appears to suggest that the conviction on count 4 must be reversed for this reason.

Because Hurtado has raised this argument for the first time in his reply brief, it is unnecessary for us to address it. (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11; *Jameson v. Desta* (2009) 179 Cal.App.4th 672, 674, fn. 1; *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3.)

If we were to address the issue, we would find the variance to be immaterial and nonprejudicial. "No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of

form which does not prejudice a substantial right of the defendant upon the merits." (§ 960.) "The test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense or placed in danger of being twice put in jeopardy for the same offense." (*People v. LaMarr* (1942) 20 Cal.2d 705, 711.)

In this case, the two offenses are set forth in the same section of the Penal Code and are subject to the same sentences. The nature of the prosecution admits of no possibility that Hurtado was misled; the victim testified and there is no indication that her testimony came as a surprise. The jury instructions given by the court incorrectly cited section 136.1, subdivision (a)(1), but they correctly told the jury that to convict, it must find that Hurtado "*tried* to prevent or discourage or prevented or discouraged" Alma from telling the authorities about the crime. (Italics added.) We see no way in which Hurtado could have been prejudiced by the variance.

## DISPOSITION

The sentence on count 4 is vacated and the case is remanded for resentencing on that count. The judgment is affirmed in all other respects.

_____
PEÑA, J.

WE CONCUR:


_____
WISEMAN, Acting P.J.


_____
DETJEN, J.

26.