Filed 3/5/21  P. v. Luc CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BINH T. LUC,<br><br>        Defendant and Appellant. | A153870<br><br>(City & County of San Francisco Super. Ct. No. 223799) |

Defendant Binh T. Luc appeals a judgment convicting him of five counts of first degree murder, five counts of attempted robbery and two counts of residential burglary, and sentencing him to multiple, consecutive terms of life in prison without the possibility of parole. The bulk of defendant's appellate briefing is devoted to the contention that his murder convictions must be reversed because of statutory amendments to the felony-murder rule that were enacted after his trial. The California Supreme Court has recently held, however, that this issue is not cognizable on appeal and must be raised in the first instance by a petition for relief in the trial court. (*People v. Gentile* (2020) 10 Cal.5th 830, 853-854.) What remains are defendant's arguments that the jury was not properly instructed on aider and abettor liability for premediated, willful and deliberate murder, and that there is no substantial evidence to support his convictions for premediated, willful and deliberate murder, three of his five convictions for attempted

1

robbery and one of his burglary convictions. Defendant also asserts that the court relied on an unsupported aggravating factor in imposing consecutive terms, and that the case must be remanded for resentencing so that the court may exercise its discretion to strike his prior conviction enhancements and conduct a hearing on his ability to pay the $10,000 restitution fine imposed by the court. We agree that three convictions for attempted robbery must be reversed based on a lack of substantial evidence and that the matter must be remanded for resentencing but affirm the judgment in all other respects.

## BACKGROUND

Defendant was charged with five counts of murder (Pen. Code,[1] § 187, subd. (a)) with special circumstances of multiple murders (§ 190.2, subd. (a)(3)), murder in the commission of robbery or attempted robbery (§ 190.2, subd. (a)(17)(A)), murder in the commission of burglary (§ 190.2, subd. (a)(17)(G)), and lying in wait (§ 190.2, subd. (a)(15)) as to one of the counts; five counts of first degree residential robbery (§ 211); five counts of attempted first degree residential robbery (§§ 644, 211); and two counts of first degree residential burglary (§ 459) when a person other than an accomplice was present in the residence (§ 667.5, subd. (c)(21)). With respect to each of the counts, the information alleged that defendant personally used a deadly weapon. (§ 12022, subd. (b)(1).) Four prior felony convictions were also alleged. (§ 667, subds. (a)(1), (d), (e); § 1170.12, subds. (b), (c))

At trial, the prosecutor argued that defendant went to Vincent Lei's home, lured him back into his house, then alone or with accomplices killed Lei, his wife, mother, father and sister, and stole money from their house. Defendant disputed his participation in the crimes and argued that the murders were committed by multiple other persons as gang, loan-shark style

---

[1] All statutory references are to the Penal Code unless otherwise noted.

2

killings recriminating for Lei's failure to pay loan shark or drug debts. The following evidence was offered at trial:

On the morning of March 23, 2012, police officers responding to a 911 call found five dead bodies in a home on Howth Street in San Francisco. The home consisted of the main house with an upstairs and an in-law unit accessed from the ground level. Lei's wife was found in the living area of the in-law unit. His parents were found in the garage. Lei was found on the ground level entryway to the upstairs unit. Lei's sister was found upstairs in her bedroom.

The victims had been badly beaten. All of the bodies had multiple skull fractures with small semi-circular abrasions to the heads probably caused by a hammer and each body's wrist had been slit to the bone. The crime scene was covered in blood, paint, water, and gray powdered concrete mix. There were empty bottles of bleach, cleaners, vegetable oil, paint, and other liquids at various locations throughout the building. Swabs of possible blood were taken throughout the crime scene, which was also processed for fingerprints.

A witness reported seeing a woman, later identified as the relative of the victims who called the police, standing in front of the house the morning after the murders "screaming" into her cell phone that "the money had been taken." When the relative was subsequently asked about the missing money, she denied saying the money was gone and claimed to know nothing about money kept at the house.

Two friends and colleagues of Lei testified that they were with Lei at 11:00 p.m. on March 22, when he received a phone call from his wife. They heard Lei say, "Who is looking for me?" and "Ah, Ping" and "What does he want?" and "Let me talk to him." Lei asked what there was to talk about and said he would be home soon. Then to his wife he repeated that he would be

3

home soon. After the call, Lei said that Ping was looking for him and was waiting for him at his home. Both witnesses knew defendant by his nickname Ping and identified him from police photos. Lei left to return home about 10 to 20 minutes after the phone call ended. When Lei failed to meet these witnesses the following day as planned, they went to his house and saw the police. Concerned about Lei, they called defendant who denied having seen Lei the night before. After speaking with defendant, they immediately contacted the police.

Defendant was arrested at a motel on March 24. Officers found $6,050 in defendant's rear pants pocket and $518 in his wallet. Defendant's car was searched and swabs of possible blood and paint were collected. Defendant's residence was also searched. In the garage, officers found a bag containing a wet pair of jeans with blood and paint stains, along with a wet white shirt with paint stains the same color as the paint at the Howth Street house. Near the bag was a bleach bottle similar to the ones at the Howth Street house that appeared to have bloodstains on it.

The jeans found in defendant's garage were swabbed and DNA found on the jeans matched defendant's DNA profile, Lei's DNA profile and the profile of Lei's mother. Swabs from bloodstains inside defendant's vehicle matched Lei's profile. Swabs from bloodstains taken both upstairs and downstairs inside the Howth Street house contained DNA matching both defendant's and Lei's, often mixed in the same sample. Both defendant's and Lei's blood was also found on an envelope found in a nightstand in Lei's bedroom. In addition, a latent fingerprint from a Windex bottle found on the upstairs kitchen counter at the Howth Street house matched defendant's left index finger.

4

Finally, the prosecution played a tape recording of a conversation between defendant and his brother in which defendant tells his brother he was gambling until 10:00 p.m. the evening of the murders and lost money.

The defense presented testimony by two neighbors who, between 1:30 and 2:00 a.m. on March 22, heard a male voice coming from the Howth Street house saying "get down on the ground now." The speaker was using English and did not have an accent.[2] The defense also questioned the police investigators regarding their investigation into information that Lei and his wife had been involved in marijuana sales and that in 2009 and 2010 a hit had been put out on Lei because of loan sharking at a casino. Finally, defendant presented evidence to support his argument that the crime was not financially motivated and that he was not in need of money. He introduced evidence that many items of value remained in the house after the murder including $2,000 in cash found in a jacket pocket and that at the time of the murders he was earning $45.82 per hour as a plumber and pipefitter. To explain the cash found on him at the time of his arrest, he introduced evidence that a month before the murder he had cashed a refund check issued to him by a retail store for $5,750.50.

In rebuttal, the prosecutor presented evidence of defendant's gambling history. According to a casino employee, the casino keeps a record of all transactions over $2,000. The casino records showed that defendant purchased $5,100 in chips between February 27 and March 23 but had no record of any redemption during that time period.

The jury found defendant guilty of five counts of first degree murder, five counts of attempted first degree residential robbery, and two counts of

---

[2] Defendant, as well as many of the witnesses, primarily spoke Mandarin Chinese and required an English interpreter.

first degree residential burglary. The jury found true the allegation that a person other than an accomplice was present during the burglaries and found true the special circumstance allegations of multiple murders and of lying in wait as to the murder of Lei. The jury found defendant not guilty of five counts of first degree residential robbery and made no finding on the personal use of deadly weapon enhancements or other special circumstances allegations. The allegations on which no findings were made were dismissed by the prosecution. The court found the allegations regarding defendant's four prior felony convictions to be true.

Defendant was sentenced to five consecutive terms of life without the possibility of parole for each of the murders. The court imposed one five-year prior felony conviction enhancement on each of the murder counts but stayed the remainder. The court also stayed the terms of 25 years to life imposed for the attempted robberies and the burglaries.

Defendant timely filed a notice of appeal.

## DISCUSSION

### 1. *Defendant is not entitled to relief under Senate Bill No. 1437 on his direct appeal.*

At trial, the prosecution argued that defendant was guilty of first degree murder either because he personally murdered or aided and abetted in the premediated, willful and deliberate murders of the five victims or under the felony murder rule, because the murders were committed in the course of a burglary or attempted robbery.

At the time of defendant's trial, "under the former felony-murder rule a defendant could be convicted of murder without a finding of malice if a victim was killed during an underlying 'predicate' felony." (*People v. Prado* (2020) 49 Cal.App.5th 480, 486, citing § 189 & CALCRIM No. 540A ["A person . . . may

6

be guilty of felony murder even if the killing was unintentional, accidental, or negligent."].) Senate Bill No. 1437, effective in 2019, " 'amend[ed] the felony murder rule . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) Substantively, Senate Bill 1437 accomplishes this by amending [Penal Code] section 188, which defines malice, and [Penal Code] section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)[3] Senate Bill

---

[3] Section 188 now reads in relevant part: "(a) For purposes of Section 187, malice may be express or implied. [¶] . . . [¶] (3) Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Section 189 now reads in relevant part: "(a) All murder that is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or that is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 287, 288, or 289, or former Section 288a, or murder that is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. [¶] . . . [¶] (e) A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

No. 1437 also adds section 1170.95, "which allows those 'convicted of felony murder . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts. . . .' (§ 1170.95, subd. (a).)" (*Martinez, supra,* at p. 723.)

Defendant argues his murder convictions must be vacated under Senate Bill No. 1437 because the prosecution did not prove that he was the killer and the jury did not make the necessary findings that he acted with the intent to kill or was a major participant in the underlying felony who acted with reckless indifference to human life. Our Supreme Court recently held that relief under Senate Bill No. 1437 must be pursued first in the trial court by way of a petition for resentencing under section 1170.95. (*People v. Gentile, supra,* 10 Cal.5th at pp. 853-854.) In a supplemental letter brief, defendant notes that *Gentile* does not address his argument that "[c]onstruing section 1170.95 as the exclusive remedy for accessing rights afforded under [Senate Bill No.] 1437 unreasonably requires appellant to forfeit his constitutional double jeopardy right and right to invoke collateral estoppel as a condition for accessing those rights." As the court recently explained in *People v. Hernandez* (2021) 60 Cal.App.5th 94, "[a]n evidentiary hearing under section 1170.95 . . . does not implicate double jeopardy because section 1170.95 'involves a resentencing procedure, not a new prosecution.' [Citation.] The retroactive relief provided by section 1170.95 is a legislative 'act of lenity' intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause. [Citations.] And even if a section 1170.95 evidentiary hearing were akin to a 'reprosecution' [citation] for purposes of the double jeopardy clause, prohibitions against double jeopardy do not prevent a retrial where 'a

conviction is not reversed on appeal for insufficient evidence but because of a retroactive change in the law [such as section 1170.95].' " (*Id.* at p. 111, citing *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1115-1116, review granted Nov. 13, 2019, S258175.) For these reasons, we do not believe that defendant's argument would alter the Supreme Court's conclusion that "Section 1170.95 is the exclusive avenue by which those previously convicted of murder under now-invalid theories may obtain retroactive relief." (See *People v. Duchine* (2021) __ Cal.App.5th __, __ [2021 Cal.App. Lexis 114, p. *14].) Accordingly, defendant's argument that he is entitled to relief under Senate Bill No. 1437 is not cognizable in the present appeal. To the extent that the issues addressed below implicate the felony murder rule, we discuss this doctrine only as it existed at the time of trial. (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1158.)[4]

**2. *The jury was properly instructed on aider and abettor liability*.**

Defendant contends the trial court erred in instructing the jury, pursuant to former CALCRIM No. 400, that an aider and abettor is "equally guilty" as the actual perpetrator.[5] He argues that the instruction was

---

[4] Defendant's request that this court take judicial notice of Senate Bill No. 1437 and Senate Concurrent Resolution No. 48 is denied as unnecessary and irrelevant.

[5] The trial court instructed the jury: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime. [¶] *Those who aid and abet a crime and those who directly perpetrate the crime are*

9

prejudicially misleading because "[t]here was evidence suggesting that others engaged in brutal gangland fashion violence killing five Lei family members, but none that [he] killed any victims. Yet, based on [his] aiding and abetting, jurors were misdirected that 'equally guilty' was the governing principle to find him guilty." Defendant suggests that CALCRIM No. 400 as given improperly allowed the jury to convict him of first degree murder based on the mental state of his accomplices, instead of his own mental state.[6]

Our Supreme Court has held that the "equally guilty" language used in former CALCRIM No. 400 "generally stated a correct rule of law." (*People v. Johnson* (2016) 62 Cal.4th 600, 639-640 (*Johnson*), quoting *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433; see also *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 [former CALCRIM No. 400 is "generally correct in all but the most exceptional circumstances."] (*Samaniego*).) In *Johnson, supra*, 62 Cal.4th at page 640 and *Samaniego, supra*, 172 Cal.App.4th at page1163 the courts acknowledged, however, that confusion might occur if defendant is charged as an aider and abettor and there is evidence that the aider and abettor had a less culpable mental state than the perpetrator.

---

*principals and are equally guilty of the commission of that crime.* [¶] You need not unanimously agree, nor individually determine, whether a defendant is a direct perpetrator or an aider and abettor. You need not choose among the theories, so long as each of you is convinced of his guilt as either a direct perpetrator or as an aider and abettor beyond a reasonable doubt." (Italics added.)

[6] Defendant also suggests the instruction was improper because it undermined the stated intentions of Senate Bill No. 1437 by allowing the prosecutor to argue that defendant was guilty of felony murder "without any of the elements needed to establish [his] culpability as an aider/abettor under section 189, subdivision (e), added by SB 1437." As set forth above, this argument is not cognizable on appeal.

10

In *Johnson, supra*, 62 Cal.4th at page 640, the court found that the instruction was not misleading where there was no evidence suggesting that defendant's mental state was less culpable than that of the actual killer. The court added that there was nothing "in the record suggesting that the jurors may have believed the 'equally guilty' language in former CALCRIM No. 400 required them to determine defendant's criminal liability based on [his accomplice's] mental state at the time of the killing, rather than considering defendant's own mental state." (*Ibid.*) The court also noted that the jury was instructed with CALCRIM No. 401, which informed the jury that "for them to find defendant guilty of murder as an aider and abettor the prosecution must prove that defendant knew [the perpetrator] intended to kill [the victim], that he intended to aid and abet [the perpetrator] in committing the killing, and that he did in fact aid him in that killing, which would have cleared up any ambiguity arguably presented by former CALCRIM No. 400's reference to principals being " 'equally guilty.' " (*Id.* at pp. 610-641.)

In *Samaniego, supra*, 172 Cal.App.4th 1148, the court found any potential confusion in CALCRIM No. 400 harmless beyond a reasonable doubt because the jury necessarily found defendant possessed the requisite intent under other instructions. The court explained, "The jury necessarily found that appellants acted willfully with *intent to kill*. It was instructed regarding the multiple murder special circumstance in accordance with CALCRIM No. 702 as follows: "If the defendant was not the actual killer then the People have the burden of proving beyond a reasonable doubt that he acted with the intent to kill for the special circumstance of multiple murder convictions to be true. If the People have not met this burden, you must find this special circumstance has not been proved true for this defendant.' (Italics added.) The jury found the special circumstance to be true, thereby

necessarily finding that each appellant had the specific intent to kill." (*Samaniego, supra*, at p. 1165.)

As in *Johnson* and *Samaniego,* there is no basis for confusion in this case and any potential error in this regard undoubtedly was harmless. There is no evidence suggesting that defendant's mental state was any different, let alone less culpable, than that of any of his unidentified accomplices. To the contrary, the evidence that defendant actively lured Lei back to the house supports a reasonable inference that he was more culpable than his unidentified accomplices. As in *Johnson*, the jury in this case was instructed that it must find the requisite specific intent under CALCRIM No. 401. Moreover, defendant concedes that the jury did find defendant had an intent to kill Lei as shown in their true finding of the lying in wait allegation and the related instruction. (CALCRIM No. 728.) Nothing in the record suggests defendant's intent varied between the victims. To the contrary, each victim was killed in the same fashion with likely the same weapons. Similarly, as in *Samaniego*, the jury in this case also found true the multiple murder special circumstance allegation, which required it to find that he acted with the intent to kill.[7] Accordingly, the jury necessarily found that defendant

---

[7] As defendant notes, the jury was also instructed pursuant to CALCRIM No. 721 that to find the multiple murder circumstance true, it must find that the defendant has been convicted of at least one charge of first degree murder and at least one additional charge of either first or second degree murder. Contrary to defendant's argument, the jury was not likely to disregard CACRIM No. 702 and rely solely on CALCRIM No. 721. CALCRIM No. 702 is the more specific instruction that is applicable only after the jury determines that defendant is guilty of murder but was not the actual killer. (See *People v. Burton* (2018) 29 Cal.App.5th 917, 925 ["We must consider the instructions together as a whole, to determine whether it is reasonably likely a jury would interpret an instruction in a particular way, because we presume jurors understand and correlate all of the instructions."].)

12

intended to kill the victims. Any possible error was harmless beyond a reasonable doubt.

3. ***Substantial evidence supports defendant's murder convictions***.

As set forth above, the case was submitted to the jury on two theories of liability—willful, premeditated, deliberate murder and felony murder—and the jury was instructed that although they must "all agree that the People have proved that defendant committed murder," they did "not need to agree on the same theory." Because the jury did not return a finding on the special circumstance allegations that the murders occurred in the course of the burglaries or attempted robberies, we cannot say that the jury necessarily relied on one theory or the other.

On appeal, defendant does not challenge the sufficiency of the evidence in support of his conviction under the felony-murder rule as it existed at the time of trial. He contends, however, that his convictions must be reversed because there is no substantial evidence that he committed willful, premeditated, deliberate murder. Specifically, he argues that there is no direct evidence and only limited circumstantial evidence that he was the actual killer of all five victims and no substantial evidence that he aided and abetted in the murders.

Assuming without deciding that the evidence is insufficient to establish that defendant personally murdered each victim, ample evidence supports his conviction based on aiding and abetting. As discussed above, the jury was required to find that "1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The

13

defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." (CALCRIM No. 401.)

There is no dispute that the victims were murdered. The evidence establishes that defendant went to the victims' home before the murders and lured Lei back to the house. Evidence that Lei was found lying on top of his wallet with his keys nearby in the entry way strongly supports the inference that he was ambushed and killed upon entry. As the prosecutor explained in closing, the fact that blood from Lei's mother was found on Lei's body suggests that she had already been killed and her blood transferred to Lei by defendant or an accomplice. Similarly, Lei's blood was found upstairs in the room where his sister's body was found, suggesting that she was killed last. Defendant's fingerprint on the Windex bottle found upstairs and his blood found on the hallway wall and upstairs light switch pole confirms that he went upstairs. As the prosecutor argued in closing, Lei is the "nexus" or connection to the upstairs crimes. Lei's blood "did not just jump upstairs . . . . Defendant is transferring, transporting [Lei's] blood." Finally, contrary to defendant's suggestion, the Attorney General does not rely on "speculation that [defendant] destroyed evidence showing he murdered the five victims." The paint found on his clothes and his fingerprint on the Windex bottle directly connect him to the clean-up after the murders. The jury could reasonably infer from this evidence that, even if defendant did not swing the hammer that killed each victim, he knew that the perpetrator intended to kill the victims and that he intended to and did aid and abet in the commission of the murders.

14

**4. *Substantial evidence supports defendant's convictions for two but not five counts of attempted robbery*.**

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; *People v. Bonner* (2000) 80 Cal.App.4th 759, 763 (*Bonner*).) When property taken is jointly held by two or more individuals, a defendant may be convicted of the robbery of each individual subjected to force or fear. (*Bonner, supra*, at pp. 763-764.) "The crime of attempt occurs when there is a specific intent to commit a crime and a direct but ineffectual act done towards its commission. [Citation.] ' "An attempt connotes the intent to accomplish its object, both in law . . . and in ordinary language." [Citation.]' [Citation.] The act required must be more than mere preparation, it must show that the perpetrator is putting his or her plan into action. That act need not, however, be the last proximate or ultimate step toward commission of the crime. [Citation.] Where the intent to commit the crime is clearly shown, an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown." (*Id.* at p. 764.)

Here, defendant was charged with five counts of robbery and five counts of attempted robbery. Defendant was acquitted of the robbery charges but convicted of five counts of attempted robbery. On appeal, he concedes that there is sufficient evidence to support his convictions with regard to Lei and his wife. The evidence that defendant was in need of money and that he searched their bedroom is sufficient to support the reasonable inference that he harbored an intent to steal from Lei and his wife at the time of their murders and that they were murdered as a means of taking their money. (*People v. Abilez* (2007) 41 Cal.4th 472, 507-508 [evidence that defendant, immediately after killing the victim, stole several items from her home is

15

relevant circumstantial evidence of his intent at the time of the murder];
*People v. Lewis* (2001) 25 Cal.4th 610, 643 ["Although the evidence is
circumstantial, the intent required for robbery . . . is seldom established with
direct evidence but instead is usually inferred from all the facts and
circumstances surrounding the crime."].)

Defendant contends, however, there is no substantial evidence that he
intended to take money from Lei's parents and sister at the time of their
murders. He argues that there is no physical or forensic evidence that he
entered the bedrooms occupied by Lei's parents or sister or that he searched
those rooms for money. The Attorney General argues that it is "readily
inferable" based on the evidence that defendant tried to take money from Lei
and his wife that he "tried to take money from the other people present at the
scene." The Attorney General continues, "[Defendant] did not need to leave
evidence of his presence in the upstairs bedrooms to permit the jury to make
its determinations that he was guilty of five counts of attempted robbery. The
victims were systematically beaten, the rooms were systematically looted, the
victims were systematically executed, and evidence of the crimes was
systematically destroyed." Contrary to this argument, there is no evidence
that the upstairs bedrooms belonging to Lei's parents and sister were
searched. That they were beaten in the same manner as Lei and his wife
sheds no light on whether he intended to steal from anyone other than Lei
and his wife. Accordingly, the convictions for attempted robbery under counts
6, 9, and 12 must be reversed.

**5. *Defendant was properly convicted of two counts of burglary*.**

The Howth Street property consisted of two residential units: the main
upstairs unit and an in-law unit in the basement. Defendant was convicted
under count 16 with the burglary of the downstairs in-law unit and under

16

count 17 with the burglary of the main living quarters upstairs. Defendant contends that while the property may have had two units, it was treated by the family as one residential unit so that he could be convicted of only one count of burglary. (See *People v. Garcia* (2016) 62 Cal.4th 1116, 1119 [entry with felonious intent into a structure and a room within that structure does not permit multiple burglary convictions]; *People v. Richardson* (2004) 117 Cal.App.4th 570, 575 (*Richardson*) ["[B]urglary of different unlocked rooms in a single-family residence constituted a single burglary."].) We disagree.

In *People v. Garcia, supra,* 62 Cal.4th at pages 1119-1120, the court explained, "Where a burglar enters a structure enumerated under section 459 with the requisite felonious intent, and then subsequently enters a room within that structure with such intent, the burglar may be charged with multiple burglaries only if the subsequently entered room provides a separate and objectively reasonable expectation of protection from intrusion relative to the larger structure. Such a separate expectation of privacy and safety may exist where there is proof that the internal space is owned, leased, occupied, or otherwise possessed by a distinct entity; or that the room or space is secured against the rest of the space within the structure, making the room similar in nature to the stand-alone structures enumerated in section 459." The court identified several "objective indications" or "characteristics" that signify a "distinct possessory or security interest," such as a "locked door to an external space, a sign conveying restricted access to those present in the external space, or the location of a room in relation to a public area." (*Id.* at pp. 1127, 1129.)

In *Richardson, supra,* 117 Cal.App.4th 570, defendant, who was visiting his sister, entered the bedrooms of his sister and her roommate while the occupants were not home to steal items and was convicted of two counts

17

of burglary. The court held that entry into the bedrooms of the two roommates could not constitute separate burglaries. The court reasoned that evidence that there were no locks on the bedroom doors and that the defendant's sister stored clothing in her roommate's closet demonstrated that the roommates did not have separate reasonable expectations against unauthorized entry. (*Id*. at p. 575.) The court acknowledged that "the policy of protecting occupants with reasonable expectations of separate protections" may be advanced by convicting the defendant of separate burglaries if "he formed the intent to burglarize the second bedroom after burglarizing the first," but that because there was no evidence regarding defendant's intent, two burglary convictions were inconsistent with the purpose of the burglary statute. (*Ibid*.)

Here the evidence established that the property had two distinct residential units. The in-law unit was entered from a separate entrance near the garage on the ground level and the upstairs "main house" unit was entered through a typical front door. Although the charging document listed all five victims as occupants of both units, evidence recovered at the scene suggested the bedroom in the downstairs in-law unit was occupied by Lei and his wife and the two bedrooms in the upstairs unit were occupied by Lei's parents and sister. Contrary to defendant's argument, the absence of evidence that the entrance to the in-law unit was locked is not determinative.

After the murder and attempted robbery of the first four victims, all of which occurred on the ground level of the home, defendant proceeded upstairs to the room where Lei's sister was killed. Lei's sister had a reasonable "expectation of privacy and safety" in the upstairs unit and, more specifically, in her bedroom. (See *People v. Sparks* (2002) 28 Cal.4th 71, 87 ["[T]the 22-year-old victim, living in her family's home, reasonably could

18

expect significant additional privacy and security when she retreated into her own bedroom."].)

Contrary to defendant's argument and unlike in *Richardson,* imposing liability for two burglaries does not "undermine the policy and purpose underlying the concept of burglary." *Richardson* recognized that "[t]he purpose of the burglary laws is to forestall situations that are dangerous to personal safety caused by the unauthorized entry of an intruder into an inhabited dwelling" and that "a different burglary occurs each time the perpetrator enters into a separate dwelling space if a new and separate danger is posed to each of the occupants upon entry into each dwelling." (*Richardson, supra,* 117 Cal.App.4th at p. 574.) Viewing the evidence in the light most favorable to the two verdicts, a rational trier of fact could have concluded defendant formed a separate intent to murder Lei's sister only after killing and attempting to rob the other members of her family. Thus, he entered the upstairs unit and specifically the sister's bedroom with that newly formed intent. Defendant's entry into the upstairs dwelling unit posed a new and separate danger to Lei's sister. Accordingly, defendant's two burglary convictions were supported by sufficient evidence and consistent with the policy underlying the burglary statute.

6. ***The case must be remanded for resentencing.***

a. <u>Senate Bill No. 1393</u>

Defendant's prison sentence included five 5-year section 667, subdivision (a) enhancements. Defendant contends that as a result of Senate Bill No. 1393, which became effective in 2019, we should remand this matter so that the trial court can exercise its discretion to determine whether to strike these enhancements. The Attorney General acknowledges this argument is well-founded. We agree and will remand to permit the trial court

19

to exercise its discretion under section 1385, subdivisions (a) and (c), as to defendant's section 667, subdivision (a) enhancements. We express no opinion as to how the trial court should exercise that discretion. (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971.)

b. <u>Aggravating Circumstances</u>

The fact that a defendant was armed with or used a weapon at the time of the commission of the crime is a factor the court may consider in exercising its discretion to impose consecutive prison terms. (Cal. Rules of Court, rule 4.421(a)(2).) Here, although the jury was unable to reach a finding as to whether defendant personally used a dangerous weapon in the commission of the murders, at sentencing the court found that a preponderance of the evidence supports the conclusion that defendant was armed with a weapon.[8] The court relied on that factor, among others, to impose consecutive life terms on each of the murder counts.

Defendant contends that there is no substantial evidence to support the finding that he was personally armed with a dangerous weapon. The section 12022, subdivision (b)(1) sentence enhancement requires defendant be personally armed with a deadly weapon. (Compare § 12022, subd. (b)(1)

---

[8] Even when a jury finds a weapons enhancement not true, the court may still find by a preponderance of the evidence that the defendant used a weapon as an aggravating circumstance. (*People v. Lewis* (1991) 229 Cal.App.3d 259, 264; see also *People v. Gragg* (1989) 216 Cal.App.3d 32, 44 ["The fact prosecution evidence does not prove the guilt of the defendant on a charge beyond a reasonable doubt does not rob that evidence of its informative value, nor does it make any information gleaned from such evidence unreliable."]; *People v. Santamaria* (1994) 8 Cal.4th 903, 922 ["[T]he jury's not true finding on the enhancement allegation does not mean defendant did not use the knife, only that there was a reasonable doubt that he did."].) In this case, the jury did not make a "not true" finding on the dangerous weapon enhancement. It was simply unable to reach a unanimous decision on that question.

[enhancement applies to "person who personally uses a deadly or dangerous weapon" in the commission of the crime] with § 12022, subd. (a)(1) [enhancement for person who is "armed with a firearm" applies "to a person who is a principal in the commission of a felony or attempted felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm."].) The rules of court state merely that the fact that "defendant was armed with or used a weapon at the time of the commission of the crime" is a factor the court may consider. " 'A person is "armed" with a deadly weapon when he simply carries a weapon or has it available for use in either offense or defense.' " (*People v. Garcia* (1986) 183 Cal.App.3d 335, 350.)

The Attorney General argues that the murders were committed with hammers and knives and that based on his presence and participation in the crimes, "[t]he evidence strongly suggests that [defendant] wielded a hammer or a knife during the commission of the murders when he either killed one or more of the victims or aided and abetted their murders and injured himself doing so." We agree that substantial evidence establishes, at a minimum, that the hammer and knife, if not personally used by defendant, were "available for use in either offense or defense" by defendant.

In any event, the court relied on other factors to impose the consecutive term, including that the crimes involved great violence, great bodily harm and other acts disclosing a high degree of cruelty, viciousness and callousness, that the manner in which the crimes were carried out indicated planning and that defendant's violent conduct indicates a serious danger to society. Any one of these other factors was sufficient to justify consecutive terms. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1371 ["One aggravating factor is sufficient to support the imposition of an upper term."].)

c. <u>Restitution Fine</u>

Defendant contends that under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the trial court violated due process and imposed an excessive fine on him when it ordered a restitution fine of $10,000 (§ 1202.4, subd. (b)(1)) without holding a hearing on his ability to pay. The Attorney General disputes the merits of defendant's argument but concedes that because this case must be remanded for the court to exercise its discretion pursuant to Senate Bill No. 1393, this court should also "remand the matter to the trial court so that [defendant] may request a hearing and present evidence demonstrating his inability to pay the fines, fees and assessments imposed by the trial court." (*People v. Castellano* (2019) 33 Cal.App.5th 485, 491.) We agree.

## DISPOSITION

Defendant's conviction on counts 6, 9, and 12 are reversed and the matter is remanded for resentencing. In all other respects the judgment is affirmed.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
TUCHER, J.

22